237 U.S. 220 (1915)
CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY
v.
RAILROAD COMMISSION OF WISCONSIN.
No. 198.
Supreme Court of United States.
Argued March 12, 1915.
Decided April 12, 1915.
ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.
*221 Mr. Robert Bruce Scott and Mr. Andrew Lees, with whom Mr. Chester M. Dawes was on the brief, for plaintiff in error.
Mr. Walter Drew, with whom Mr. W.C. Owen was on the brief, for defendant in error.
*222 MR. JUSTICE McKENNA delivered the opinion of the court.
Error to review a judgment of the Supreme Court of Wisconsin sustaining an order of the railroad commission of that State requiring under a law of the State the railroad company to stop two of its passenger trains, each way daily, at the station of Cochrane.
The statute under which the order was made is as follows:
"Every corporation operating a railroad shall maintain a station at every village, whether incorporated or not, having a post office and containing two hundred inhabitants or more, through or within one-eighth of a mile of which its line or road runs, and shall provide the necessary arrangements, receive and discharge freight and passengers, and shall stop at least one passenger train each day each way at such station, if trains are run on such road to that extent; and, if four or more passenger trains are run each way daily, at least two passenger trains each day each way shall be stopped at each and every such station. Every such corporation neglecting or refusing fully to comply with this section, after demand therefor by any resident of such village, shall forfeit not *223 less than twenty-five nor more than fifty dollars for each and every day such neglect or refusal shall continue, one-half to the use of the person prosecuting therefor." Wisconsin Session Laws, 1911, amending § 1801.
The order was made in pursuance of a petition filed with the commission by an inhabitant of the town, alleging the inadequacy of the passenger service and praying for relief under the statute. The facts presented to the commission are, as stated by the Supreme Court, as follows:
"The passenger service at Cochrane was as follows: Northbound train No. 91, a freight, carrying passengers, daily, except Sunday, due at 10:17 a.m.; passenger train No. 53, north-bound, daily, due at 10:58 a.m.; southbound passenger train No. 54, daily, due at 9:09 a.m.; and freight train No. 92, south-bound, carrying passengers, daily, except Sunday, due at 1:10 a.m. It is admitted that Cochrane has a post office. Further facts shown by the hearing are thus stated in the decision of the Railroad Commission: `Cochrane is an incorporated village of about 260 inhabitants. It has four general stores, two saloons, two lumber yards and planing mills. The village of Buffalo, having a population of about 250, lies a short distance west of Cochrane. Alma, the county seat of Buffalo County, having a population of 1,000, is situated 8.3 miles north of Cochrane. Fountain City, having a population of approximately 1,000, lies about eight miles south of Buffalo. All of the limited trains on respondent's line stop at Alma. Two passenger trains each way daily stop at Fountain City. The respondent's road is located on the east bank of the Mississippi river, and runs through a territory that is sparsely settled. About 90 per cent. of all the passenger traffic over this line consists of people going from Chicago to St. Paul and points in Minnesota, the Dakotas, and the entire Northwest and Canada. Two trains are run each way daily between Chicago and *224 Portland and Seattle. One train leaves Chicago in the morning, and from St. Paul runs over the Northern Pacific line to the Northwest. Another train leaves Chicago in the evening, and from St. Paul goes over the Great Northern line to the Northwest. There are two corresponding trains eastbound. There is also a train each way daily between Chicago and Minneapolis, known as the Minnesota Limited, which serves the traffic to Minneapolis and St. Paul on the one hand, and to Chicago and St. Louis on the other. In addition to these interstate trains, there is a local train each way running between Savanna and Minneapolis, which takes care of the traffic in the state of Wisconsin. The west-bound train from Chicago to the Northwest by way of the Northern Pacific line from St. Paul is known as train No. 51, and is composed of standard Pullman and tourist cars. The number of cars in the train is 12. The corresponding east-bound train is known as No. 53, and contains the same number of cars. Similar trains routed over the Great Northern line from St. Paul to and from the Northwest are known as trains 49 and 52, respectively. Trains 47 and 48 are each known as the Minnesota Limited, and each is composed of one observation car, three standard sleeping cars, one St. Louis standard sleeping car, two Chicago coaches, one combined mail and baggage car, and two baggage cars. Train No. 58 consists of two sleeping cars, and from five to eight baggage and express cars. All of these interstate trains are heavy, and run at a maximum speed of 50 miles per hour in order to make connection with trains for the East at Chicago and with trains for the West at St. Paul. As the distance between Chicago and St. Paul over respondent's line is 33 miles greater than that over the line of the Chicago & Northwestern Railway Company, and 27 miles greater than that over the line of the Chicago, Milwaukee & St. Paul Railway Company, it becomes necessary for the respondent to *225 operate its trains at a high rate of speed in order to meet the schedule of time of its competitors' trains between such points as well as to make the connections mentioned.'"
The commission, expressing its view of the case presented, said: "Independent of any statutory provision on the subject, we should feel constrained to hold that the existing passenger service afforded the village of Cochrane was adequate under the circumstances, and that, therefore, interstate trains could not be required to stop at that station." And further: "This statute deprives the commission of any discretion in the matter. It fixes the quantum of passenger service for every station coming within the classification made."
The railroad company thereupon filed a petition in the Circuit Court of Dane County to set aside the order of the commission. The petition set forth the interstate character of its road, attacked the validity of the law and the order of the commission and represented their effect to be, if carried out, to stop two of its limited trains at thirteen additional stations in the State, and that such requirement would be an unwarrantable interference with interstate commerce.
The Circuit Court found that the passenger service at Cochrane was not adequate or reasonable and that the order of the commission was a reasonable exercise of the power vested in the commission, and entered a judgment dismissing the petition of the railroad company.
The Supreme Court of the State affirmed the judgment, 152 Wisconsin, 654. The court, however, disagreed with the Circuit Court in the view that the commission had exercised its discretion. The Supreme Court decided that such power was not vested in the commission nor exercised by it, and further decided that the trial court could not make an "order based upon the original exercise of its own discretion," and that the only jurisdiction conferred *226 upon it was "to pass upon the lawfulness or reasonableness of the railroad commission's order." And it was said, "In the instant case, therefore, since the railroad commission did not make an order based upon its discretion, but one based upon the statute, the only question presented by the action was the lawfulness of the order, which, of course, raised the question of the constitutionality of § 1801, Wisconsin Stats. 1911. And that question is the only one the appeal presents upon the merits." In other words, as we understand it, the statute expressed the legislative judgment of what facilities were necessary under the conditions described by the statute and left no discretion to the commission or the courts, but "deemed it best," to quote the court, "to exercise its own judgment as to what should be considered reasonably adequate passenger service for stations containing a population of 200 or more." We are brought, therefore, to a consideration of the statute and its measure.
The statute includes, necessarily, the Supreme Court held, interstate passenger trains and clearly excludes accommodation freight trains; and, so viewing it, the Supreme Court pronounced it a proper exercise of the power of the State.
In reviewing the decision we may start with certain principles as established: (1) It is competent for a State to require adequate local facilities, even to the stoppage of interstate trains or the re-arrangement of their schedules. (2) Such facilities existing  that is, the local conditions being adequately met  the obligation of the railroad is performed, and the stoppage of interstate trains becomes an improper and illegal interference with interstate commerce. (3) And this, whether the interference be directly by the legislature or by its command through the orders of an administrative body. (4) The fact of local facilities this court may determine, such fact being necessarily involved in the determination of the Federal *227 question whether an order concerning an interstate train does or does not directly regulate interstate commerce, by imposing an arbitrary requirement. Gladson v. Minnesota, 166 U.S. 427; Lake Shore R.R. v. Ohio, 173 U.S. 285; Atlantic Coast Line v. Nor. Car. Corp. Comm., 206 U.S. 1; Mo. Pac. Ry. v. Kansas, 216 U.S. 262; Cleveland &c. Ry. v. Illinois, 177 U.S. 514; Mississippi R.R. Comm. v. Ill. Cent. R.R., 203 U.S. 335; Atlantic Coast Line v. Wharton, 207 U.S. 328.
Bearing these propositions in mind, let us consider the test of the statute. The statute expresses, it is said, the legislative judgment of the conditions of its application and would seem to preclude a consideration of anything else. In other words, the test of the adequacy or inadequacy of the local facilities is determined by the statute and their sufficiency as so determined becomes the question in the case. What, then, is the test? Every village having 200 inhabitants or more and a post office, and within one-eighth of a mile of a railroad, must be given by such railroad the accommodation of one passenger train each way, each day, if trains be run to that extent, and at least two trains if four or more passenger trains be run.
The test, on first impression, is certainly quite artificial. The effect of it is that the number of trains is not necessarily determined by the local needs of a village but, it may be, by the needs of other places; not by the demands of local travel but, it may be, by the demands of interstate travel and automatically to be increased as interstate travel increases. This is pointedly so in the case at bar for the railroad runs only interstate trains. It, however, is said that the population of a village is not only a fair index of its business but also of its tributary population, and that the number of passenger trains run daily measures the amount of passenger business done and, in a degree, the ability of the railroad to furnish additional facilities *228 to the station without financial loss or without undue interference with through traffic.
And it is urged that the statute contemplates an increase of facilities to the interstate business of the villages as well as to their local business, and a comparison of receipts from the respective businesses at Cochrane and other villages shows, it is said, that the railroad receipts from interstate passenger business is over one-third that of its total passenger receipts, and, therefore, it is not accurate to say that the additional service required is at the expense of interstate traffic.
The record, however, contains no complaint of insufficient interstate facilities. The complaint which induced the proceeding before the railroad commission was of the deficiency of local facilities. Residents of Cochrane and its vicinity, it was charged, were unable to go north or south from that village by rail and return the same day, and to display the extent of the asserted inconvenience the population tributary to Cochrane was represented to be 3,000. And this was adverted to by the Supreme Court as typical of the condition at other villages, though the court recognized that "the statute must stand or fall upon its main scope and upon its general application to villages throughout the State, and not upon its particular application to Cochrane."
We have seen what the "main scope" of the statute is, but to the actual population of every village must be added, it is said, a tributary population as the cause and justification of the statute. We may assume such outlying population, but we cannot assume definite transportation needs and a certain and invariable measure of accommodation for them. This must be established in each instance. In the present case it appears that the railroad runs through a sparsely settled country, that 90% of its business is interstate, and that the trains assigned to intrastate business are not self-sustaining. The revenue *229 at Cochrane from the passenger traffic for the year ending July, 1911, was only $1,751.63, of which $985.57 was from intrastate and $765.76 from interstate business. And yet for the local traffic, already insufficient to defray the expense of its service, there are required under the fixed and resistless test of the statute two additional trains, the expense of which will be $84,000.00 a year. And in mentioning the expense we do not wish to intimate that expense is determining but only to be considered. A railroad cannot escape a duty by pleading the expense of its performance.
But it is said that increased accommodation may bring an increase of revenue. If we may so suppose, may we further suppose that the increased receipts will defray the increased expense? It is by such generalities and inferences that the statute is attempted to be supported, and we are asked to accept their vagueness as against the actual situation. The complaint is, as we have seen, that persons residing at Cochrane cannot go north or south by rail and return the same day. Such condition might be corrected by an alteration of schedules or, if that present difficulties on account of the length of the road or the necessities of the traffic, by the stopping of one train either on signal or regularly; and such accommodation has been ordered and held sufficient in cases cited by the commission, as we shall presently see. But the imperative requirement of the Wisconsin statute precludes such accommodation or any accommodation short of its own measure of two additional trains a day each way, though the local needs may be satisfied with less.
Of course, there would be some convenience at times in two extra trains  indeed, in more than two  and they may be desired; but desire is not a test of requirement, nor is convenience, absolutely considered. There is a traffic to be considered which does not originate at Cochrane and its convenience cannot be put out of view. Besides, as *230 said by Timlin, J., in his dissenting opinion "`Convenience' is an elastic term, and no doubt it would be more convenient to have a train stop every hour at this village, and it would be confessedly inconvenient if no trains at all stopped there. Between these extremes there is no doubt a broad field of legislative discretion." This court has also felt and expressed the difficulty of giving an exact definition to "adequate and reasonable facilities." "It is a relative expression," it was said, "and is to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodation asked for, and to all other facts which would have a bearing upon the question of convenience and cost." Atlantic Coast Line v. Wharton, supra, p. 335.
These, then, are the factors, and we do not put out of view the difficulties which infest the case, but, considering them all and the deference due to state legislation, we are constrained to hold the Wisconsin statute invalid. It does not determine service by the volume of the business of the villages of the State but by the requirements of business elsewhere, and limits such requirements and, it may be, prevents them by the imposition of conditions which preclude their fulfillment. This is illustrated by the facts of the pending case. The interstate trains of the railroad are required by the necessities of its interstate business. It is in competition with shorter roads, and the speed of its trains, which cannot be safely increased, and their schedule time are a necessity in this competition. This conformity to conditions must be strained or embarrassed and, it may be, prevented in order to give greater facilities than one train a day each way to villages having a post office and 200 inhabitants, not necessarily because they are not properly served but seemingly to give them a larger division of service.
*231 The Supreme Court conceded that it was "no doubt true" that to require the railroad to stop one of its limited interstate trains would seriously interfere with its through traffic, as competition "was keen and time was of the essence of such traffic." The court, however, said that neither the statute nor the order of the railroad commission requires the railroad to stop one of its limited trains, but it has the option of doing that or of putting on an extra train; and Lake Shore Ry. v. Ohio, supra, is cited to sustain the alternative. Undoubtedly the alternative can be required, but only if the local facilities be inadequate. In other words, to justify the requirement the local conditions must justify the extra facility. Oregon R.R. & N. Co. v. Fairchild, 224 U.S. 510, 528. The alternative imposed as a condition of retaining interstate trains simply because of their number would be a burden upon interstate commerce, as we have already pointed out. And this is recognized by the cases cited by defendant in error.
In State v. Railroad Commission, 110 Pac. Rep. (Wash.) 1075, an order required an additional passenger train from a town of 5,000 or 6,000 people, and having a business by the railroad, of $20,000 per month for freight and about $800 for passengers, to connect at another place. The railroad attempted to remove the complaint of want of adequate facilities by an additional service between the places but not that required by the order. It was decided that the additional facility was not sufficient and that the order was reasonable, the railroad not showing that the service "ordered by the commission would be unreasonably burdensome upon the railway company by being operated at a loss." There was no question of interference with interstate commerce.
Another order of the commission in the same case was reviewed. It required a passenger train to stop on flag at a certain spur, the railway company to elect which of its trains it would stop. The court said that in view *232 of the population centered there and the very slight service required of the railway company, the order could not be pronounced by the courts to be unreasonable. And the same judgment was declared of other orders requiring a north-bound train at one place and a south-bound train at another to stop on flag. Against these last orders there was a charge that they would tend to lengthen the running time of the trains, which were through trains (it did not appear that they were interstate), and that other towns would demand similar service and thus result in preventing the making of connections and thereby inconvenience the public. To which it was replied that the evidence did not show that the stopping would result in breaking the then connections and that it would be time enough to consider the effect of other stops when they should be ordered.
In Atchison &c. Ry. v. State, 114 Pac. Rep. (Okla.), 721, an order of the railroad commission of the State required a passenger train to stop on flag at a station called Belva. That village had a population of 30, but the country around it was thickly settled and persons could reach the county seat only by means of the railroad. The conditions were in some respects like those in the case at bar. The court said that the evidence in support of and against the order consisted of generalities and conclusions rather than of facts necessary to enable the court to determine the reasonableness and justness of the order, but the court, yielding to the presumption due to the action of the commission, and there being no evidence that the trains were fast ones or that the stopping of them would interfere with their schedule or connections with other trains, sustained the order. And the court gave consideration to the fact that the trains were required to stop only when there were passengers desirous of entering or leaving them, and that no pecuniary loss would be entailed on the railway or its interstate connections hampered.
*233 In Missouri &c. Ry. v. Town of Wilcher, 106 Pac. Rep. (Okla.), 852, trains were required to stop on flag. The order was sustained, it not appearing that there would be any pecuniary loss to the railway or that the order would "reasonably prevent or hamper the interstate connections contemplated."
Gulf, Col. &c. Ry. v. State, 169 S.W. Rep. (Texas), 385, was an action for penalties imposed by a statute of the State upon any railroad failing to obey an order of the commission of the State. The order required the railway company to stop two numbered trains at the town of Meridian, a county seat. It had a population of 1,500. The defense of the company was an attack on the order as an unlawful and direct interference with interstate commerce, the trains being interstate trains, and the local facilities it was asserted, being adequate. The case was considered in view of the established principles which we have stated and the order was sustained, the court deciding that the local facilities were inadequate and the order not a direct interference with interstate commerce.
Gladson v. Minnesota, 166 U.S. 427, sustained a statute which required every railroad corporation to stop all regular passenger trains running wholly within the State at all county seats long enough to take on and discharge passengers. The applicable principles were discussed and it was said that an order which entailed but a trifling expense and a few minutes of time was a reasonable exercise of the police power and could not be considered as a taking of property without due process of law or an unconstitutional interference with interstate commerce.
The other cases cited, not being closely applicable, need no comment. In those we have reviewed, it will be observed, the orders were made after investigation by administrative officers and the facilities required were adjusted to the local needs, not by an arbitrary formula prescribed in excess of such needs.
*234 It is contended by defendant in error that the statute is valid as an amendment to the charter of the Chicago, Burlington & Northern Railway Company, a Wisconsin corporation, and plaintiff in error's predecessor. This contention seems not to have been urged on the Supreme Court, and we may, therefore, decline to consider it; and, besides, we would be very averse to deciding that, without explicit declaration, every general law of the State applicable to corporations is enacted as an amendment to their charters. If the Supreme Court of the State had so thought it would have accepted that short way to the decision of the case and not have occupied itself with other and more complex questions. It is one thing to decide that corporations are subject to the police power of the State, and quite another to hold that every general law is an amendment to their charters. See 97 Wisconsin, 418.
Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.