State ex rel. Frisco Railroad v. Pub. Serv. Commission.

whatever, except to dismiss the original proceeding of forcible entry or unlawful detainer, whichever it may be designated. That being unquestionably true, how could we prevent quashing the record of the Court of Appeals, which undertook to take $50,000 from the defendants, when it had no jurisdiction whatever to render the judgment we quashed?

---

# THE STATE ex rel. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION.

### Division Two, February 23, 1923.

1. **INTERSTATE TRAINS:** Stopping at County Seats. The statute (Sec. 9903, R. S. 1919) requiring all regular passenger trains engaged in interstate passenger service to stop regularly at county-seat stations cannot be applied strictly to interstate trains.

2. ———: ———: Federal Regulation: Interference: Judicial Question of Fact. The power of Congress to regulate interstate commerce is exclusive, and its failure to exercise the power in any case is an expression of its will that the subject shall be free from all restrictions or impositions upon it by the several states; and whether or not a state statute, or the order of a state administrative body, does or does not directly regulate interstate commerce, by imposing an arbitrary requirement, is a question of fact, which may be determined by the courts.

3. ———: ———: Local Facilities: Interstate Passengers: Separate Consideration. In considering the question of sufficient local facilities for the accommodation of the traveling public, and the necessity for an order by a state administrative body that an interstate passenger train stop at a county-seat station to receive and discharge passengers, the interstate traffic is to be separated from the state traffic, and the inconvenience of passengers from another state in arriving at their destination in this state is not determinative of the question of sufficient local trains.

4. ———: ———: ———: Evidence: Government Operation. The fact that a certain interstate train stopped at the county-seat station during the time the Government operated the railroad is not relevant in the determination of the question whether the trains now

operated provide adequate local service, but that question must be determined by the facts at the time of the hearing.

5. ———: ———: ———: Interference. The facts of this case demonstrate that the order of the Public Service Commission requiring that an interstate train from the State of Oklahoma to St. Louis, Missouri, be stopped regularly at Neosho, Missouri, to receive and discharge passengers, was an unlawful interference with interstate commerce, and not justified by the demands for local accommodation.

Appeal from Cole Circuit Court.—*Hon. John G. Slate,* Judge.

REVERSED (*with directions*).

W. F. Evans, E. T. Miller and A. P. Stewart for appellant.

(1) The order of respondent, affirmed by the circuit court, is arbitrary, unjust, unreasonable and excessive, and is without warrant on the record. (2) The record conclusively showing that the city of Neosho is afforded ample facilities for east-bound travel without the stopping of appellant's interstate passenger train Number 10, the order of respondent, affirmed by the circuit court, requiring the stoppage of said train at Neosho, becomes a direct burden upon and an unlawful interference with interstate commerce, and is therefore void because in violation of and in conflict with Section 8, Article I, Constitution of the United States. Cleveland Railroad Co. v. Illinois, 177 U. S. 514, 521; Mississippi Railroad Com. v. Ill. Cent. Ry. Co., 203 U. S. 335, 344, 346; St. Louis-San Francisco Railroad Co. v. Pub. Ser. Comm., 254 U. S. 535; Ill. Cent. Railroad Co. v. Illinois, 163 U. S. 142; McNeill v. Southern Railroad Co., 202 U. S. 543, 561; Atlantic Coast Line v. Wharton, 207 U. S. 328, 334; Herndon v. Chicago Railroad Co., 218 U. S. 135, 156; Chicago Railroad Co. v. Wisconsin Railroad Comm., 237 U. S. 220, 226. (3) Since train No. 10 makes no stops in

Missouri west of Neosho, the only passengers who would be discharged from this train at Neosho are necessarily those brought into the State of Missouri from points in the State of Oklahoma and other states. Respondent has no power to require appellant to furnish interstate service to Neosho. Hence, the order of respondent, affirmed by the circuit court, in requiring appellant to stop said train at Neosho to discharge passengers, is unlawful and void because it is a direct regulation of interstate commerce, and is repugnant to Section 8 of Article I of the Federal Constitution, which vests in Congress the exclusive power to regulate interstate commerce. Hall v. DeCuir, 95 U. S. 485; So. Covington Railroad Co. v. Covington, 235 U. S. 537, 547; In re Rahrer, 140 U. S. 545, 555; County of Mobile v. Kimball, 102 U. S. 691; Wabash Railroad Co. v. Illinois, 118 U. S. 557, 570; Bowman v. Railway, 125 U. S. 465, 484; Atlantic Coast Line v. Wharton, 207 U. S. 334.

*R. Perry Spencer,* General Counsel, and *James D. Lindsay,* Assistant Counsel, for respondent.

(1)    The appellant was not furnishing adequate local facilities at Neosho.    (2)    It is the duty of railroad companies to furnish reasonable and adequate facilities to serve not only the local necessities, but the local convenience of the communities which they have undertaken to serve. Sec. 10436, R. S. 1919; State ex rel. Mo. Pac. Ry. Co. v. Pub. Serv. Commission, 273 Mo. 632; State ex rel. Ry. Co. v. Pub. Serv. Commission, 277 Mo. 175; Mississippi Railroad Company v. M. & O. Railroad Co., 244 U. S. 390.    (3)    The State may require railway companies to provide adequate and reasonable facilities to serve local necessities and local conveniences, even though to do so requires the stopping of interstate trains or the rearrangement of their schedules. Gladson v. Minnesota, 166 U. S. 427; Lake Shore & Mich. So. Ry. Co. v. Ohio, 173 U. S. 285; Cleveland C. C. & St. L. Ry. Co. v. Illinois,

177 U. S. 514; Atlantic Coast Line v. Wharton, 207 U. S. 328; Chicago, Burlington & Quincy Railroad Co. v. Railroad Commission of Wisconsin, 237 U. S. 220; Oregon Railroad & Navigation Co. v. Fairchild, 224 U. S. 510; Gulf, Colorado & Santa Fe Ry. Co. v. Texas, 246 U. S. 58; State ex rel. St. Louis-SanFrancisco Ry. Co. v. Pub. Serv. Commission, 235 S. W. 131.

WHITE, J.—The appeal is from a judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission in the case of the Big Spring Hotel Company against the St. Louis-San Francisco Railway Company.

The Big Spring Hotel Company, of Neosho, Missouri, complained to the Public Service Commission that the service of the St. Louis-San Francisco Railway Company, in operating trains through that city, was inadequate. Among other things, that Train No. 9, having its origin in Missouri and running in a southwesterly direction through the city of Neosho into the State of Oklahoma, did not stop at Neosho; another train, Number 10, which enters the State of Missouri from Oklahoma and proceeds in a northeasterly direction through the State of Missouri, did not stop in Neosho. The complainant asked that the defendant be ordered to stop said trains as a regular stop in the city of Neosho.

At the time the complaint was filed in the office of the Public Service Commission, on the second day of July, 1920, the train service at Neosho was as follows:

**WEST-BOUND**

| Train No. | | Leaves | | Arrives |
|---|---|---|---|---|
| 403 | St. Louis | 9:00 a. m., | Neosho | 7:35 p. m.—Stops |
| 7 | " | 9:45 p. m., | " | 10:05 a. m.—Stops |
| 9 | " | 6:35 p. m., | " | 3:40 a. m.—Does not stop |
| 1 | " | | " | 3:55 a. m.— "　"　" |

**EAST-BOUND**

| | | | |
|---|---|---|---|
| 404 | Neosho | 11:40 a. m., | Monett 12:40 —Carries passengers only to Springfield and intermediate points; no connection for St. Louis. |
| 8 | Neosho | 5:50 p. m. | St. Louis      7:08 a. m.—Stops |
| 2 | Passes through Neosho | | 2:25 a. m.—      Does not stop |
| 10 | " | "      " | 9:40 p. m.—Does not stop; arrives St. Louis 7:35 a. m. |

It will be seen by this schedule that two trains each way daily stop at Neosho. The complainant demanded that another train each way should stop at Neosho.

The Commission heard the complaint, denied the request to have No. 9, west-bound train, stop, but ordered defendant to stop Train No. 10, east-bound, which left Neosho at 9:40 p. m. and arrived at St. Louis at 7:53 a. m. The appeal is from that order relating to No. 10.

At the time the hearing was had, while two east-bound trains stopped at Neosho, one of them, No. 404, was not a through train and carried passengers no further than Springfield, so that anyone desiring to take through passage to St. Louis was obliged to take the night train, leaving at 5:50 p. m. After the hearing another schedule was put in operation, so that number 404 should leave Neosho at 9:33 a. m., and arrive at Monett at 10:40 a. m., at which point it connected with Train Number 4 from Dallas, Texas, via Monett, to St. Louis, where it arrived at 7:40 p. m., thus giving Neosho two trains east daily as far as St. Louis, This change of schedule was brought to the attention of the Commission by a motion for rehearing. The motion was denied. The complaint alleged that the failure to stop number 10 at Neosho was contrary to Section 3098, Revised Statutes 1909 (Sec. 9903, R. S. 1919), which requires all trains to be regularly stopped at its stations at all county seats.

The answer of the railroad company sets out the schedule of trains as above set forth, and among other things alleged that number 10 was an interstate train,

primarily, and especially devoted to carrying interstate passengers, interstate mail and express matter between the city of Saint Louis and points in the State of Oklahoma; that it originated in Oklahoma, and after entering the State of Missouri and before reaching Saint Louis, it stopped at only three points for the purpose of reception and discharge of passengers; at the city of Monett, where it arrived at 10:35 p. m., at the city of Springfield, where it arrived at 12:15 a. m., and departed at 12:25 a. m., and the town of Newburg, where it arrived at 4:15 a. m.

The answer further alleged that Section 3098, Revised Statutes 1909, as amended by the Act of 1917, and in the form as it now appears (Sec. 9903, Revised Statutes 1919), in so far as it purports or attempts to require regular passenger trains engaged in interstate passenger service to stop at county-seat stations, is in conflict with Section 8, Article 1, Constitution of the United States, vesting in Congress exclusive power to regulate commerce among the several states.

The only issue tendered by the complaint was the failure of the railroad company to obey Section 3098. But on the hearing of the case the evidence took a wide range in the endeavor on the part of the plaintiff to show that the service was inadequate for the needs of Neosho, and on the part of the defendant to show that it was adequate.

Two other railroads operated trains through Neosho at the time—the Kansas City Southern, running north and south, and the Missouri & North Arkansas, running from Joplin, through Neosho, and southeast into Arkansas. Neosho, at the time of the hearing, had a population of 3600 persons; many springs and summer resorts attracted a larger number of persons during the summer than during the winter months. Several witnesses were introduced who swore to complaints about inadequate service. Persons came in from Arkansas on the Missouri & North Arkansas, arriving at 9:10 p. m., too

late for Train No. 8, which went east at 5:50. It was shown that a bus line left Neosho for Joplin at 6:30 p. m., where it could make connection with many trains running in various directions; one train from Joplin went at 8:50, with which it made connection.

Train No. 10 stopped at Neosho during the period of Government operation and ceased to stop there after May 23, 1920. During the time it stopped at Neosho most people who desired to take passage to St. Louis used that train rather than Train No. 8 at 5:50, because the later train was more convenient for them. The Commission, in making the order mentioned, seemed to give weight to the fact that while under Federal control the train stopped at Neosho without apparent inconvenience, on account of the dead time at Monett. Other facts in relation to the adequacy of the train service will be noted later in the opinion.

I.   There is no doubt that Section 3098, Revised Statutes 1909, as amended (Sec. 9903, R. S. 1919), cannot be applied strictly to interstate trains. Several cases decided by this court have referred to the rule laid down by the Federal Supreme Court in relation Statute: Applica-  to interstate commerce, as affected by said tion to Interstate  regulation. A passage in the opinion Commerce.  Chicago, Burlington & Quincy Railway Company v. Railroad Commission of Wisconsin, 237 U. S. 220, l. c. 226, is quoted in several of our cases and defines the extent to which a state may regulate interstate trains. The passage is set out in State ex rel. v. Public Service Commission, 273 Mo. l. c. 637, as follows:

"In reviewing the decisions we may start with certain principles as established: (1) It is competent for a state to require adequate local facilities, even to the stoppage of interstate trains or the rearrangement of their schedules. (2) Such facilities existing—that is, the local conditions being adequately met—the obligation of the railroad is performed, and the stoppage of inter-

state trains becomes an improper and illegal interference with interstate commerce. (3) And this, whether the interference be directly by the Legislature or by its command through the orders of an administrative body. (4) The fact of local facilities this court may determine, such fact being necessarily involved in the determination of the Federal question whether an order concerning an interstate train does or does not directly regulate interstate commerce, by imposing an arbitrary requirement.''

Whether the local facilities are sufficiently provided for so as to prevent an interference by the local authorities with an interstate train is a question which has been up for discussion several times. [State ex rel. St. Louis-San Francisco Ry. Co. v. Pub. Serv. Comm., 242 S. W. 938; Lusk v. Pub. Serv. Comm., 277 Mo 264, 1. c. 287.] In the latter case this court held that the order of the Public Service Commission was not subject to attack because it unduly restricted or burdened interstate commerce. The United States Supreme Court reversed the ruling by a decision which appears in 254 U. S. 535. A number of Federal cases are cited in the case of State ex rel. Pub. Serv. Comm. 273 Mo. 1. c. 636-7.

Number 10 stopped at three points in Missouri, but all three points were terminals. At Monett the trains stopped in order to set out a combination mail car and change train crews; it stopped to change engine crews at Springfield, and Newburg was a division point. During the war time the train stopped at Neosho to take on water—an operating stop—and incidentally took on and discharged passengers. Nearly all passengers on number 10 were through passengers to St. Louis, having taken passage in Oklahoma; the number generally varied from 80 to 125, sometimes running as high as 165 and sometimes as low as 51. The defendant offered evidence to show that each additional stop of Train No. 10 would affect its schedule adversely, and if it were not for interstate traffic from Oklahoma and other states south and west of Neosho, Number 10 would not be operated at all.

It appears probable that if there were no terminal points where stops were made necessary for the change of crews or engines, there would be no stop at all for that train.

The power of Congress to regulate interstate commerce is exclusive. The failure of Congress to exercise this exclusive power in any case is an indication of its will that the subject shall be free from all restrictions or imposition upon it by the several states. [In re Rahrer, 140 U. S. 1. c. 555; Hall v. DeCuir, 95 U. S. 1. c. 490; South Covington Ry. v. Covington, 235 U. S. 537, 1. c. 548.]

However, the train *did stop* and discharge and receive passengers at three points in Missouri, and we will not infer that those stops were merely incidental to the operation of the train, and will consider the second point determined by the commission.

II.   The question is whether the service rendered by the railway company after the change in the schedule was sufficiently adequate for the needs of Neosho, so as not to justify further interference with an interstate train. Nearly all the witnesses introduced by the complainant at the hearing before the Commission were unable to give any definite figures as to the number of passengers who would be accommodated by stopping number 10, or the number who would not be sufficiently accommodated by the other trains going east from Neosho, or as to what proportion of the complaints arose from failure to accommodate interstate passengers. Some of the witnesses said the complaints were general. One witness, a taxi-driver, testified to having had as many as eight or ten calls for passengers to number ten when it stopped at Neosho. There was no knowing how many of these passengers would not have been reasonably accommodated by Train No. 8 at 5:50 p. m.

*Interference With Interstate Commerce.*

It was shown by defendant, without any contradiction on the part of the complainant, that during the month of August, 1919, ninety-four tickets were sold from Neosho to St. Louis; that was when Train No. 10 stopped at Neosho. During the month of August, 1920, sixty-six tickets were sold from Neosho to St. Louis. It is possible that the railway company took the most favorable months for comparison. However, it was entirely open to the complainants to make comparisons with other months. It was not shown what particular trains those passengers bought tickets for; it was only shown that twenty-eight more passengers bought tickets when number 10 stopped at Neosho than when it did not stop there, in a corresponding month: less than one ticket each day. Nor is there anything in evidence to show whether the difference was due solely to the failure to stop number 10 in August, 1920, or from other causes affecting the general traveling public.

Of the general complaints mentioned by the witnesses some of them were by persons coming from Oklahoma into Neosho and desiring to stop there. Persons living in Neosho had interests in Oklahoma; persons living in Oklahoma had business in Neosho. It was stated that when No. 10 did not stop at Neosho more persons got off than got on. The order of the Public Service Commission was that number 10 should be stopped at Neosho to *discharge* and receive passengers. Since number 10 dd not stop at any place in Missouri before reaching Neosho, such stoppage for their discharge only affected interstate passengers. One witness stated that from one to five got on number 10 at night when it stopped at Neosho, while more than that number got off. There was no attempt to show how any of those who got on would have been reasonably accommodated by taking number 8 at 5:50 p. m., or number 404 the next morning.

Most of the witnesses were vague and general in their statements, and said so; they failed to give any definite figures or tell the kind of passengers who made the com-

plaints.   The most definite complaints were by Tulsa people, who had bought property in Neosho and wanted to come on that train as strictly interstate passengers.

In making its finding the Public Service Commission quoted from a witness whose testimony, it said, well stated the reasons for the re-instatement of the service. This is the quotation:

"Now the value of stopping the 9:40 is of greater interest to this section than the midnight.  We have in connection with that an instance of *Tulsa people who want to come in through here*—we have quite a number of residents, Tulsa people, who have bought here; . . . they have to leave Tulsa before one o'clock to come in on the 9:50 or 11:50; with the 9:40 they could leave at six o'clock and get here on the 9:40. . . . the result was that we lost quite a number of people that used to come here and if they were busy and had to lay over until Sunday before they could come home—that created quite a great deal of inconvenience to them— either that way or go to Afton and Joplin and down here with additional cost in favor of the company."   After this complaint about purely interstate traffic the witness spoke of some inconvenience to traveling men who had to go by way of Joplin and Afton.

The Commission in its conclusions stated this:

"The time of taking this train (No. 10) and arriving at destination, as *to passengers from Oklahoma points to Neosho* and from Neosho to Monett, Springfield or St. Louis, makes it a most convenient and desirable train compared to the present service."

The Commission in this estimate failed to separate the *interstate* traffic from the state traffic and, as stated above, the interstate traffic was the more important of the two.

The Commission also found this:

"It is also shown that passengers coming north on the Missouri & North Arkansas Railroad to points east could transfer to another line of the defendant at Selig-

man, then connect with the defendant's main line train east-bound at Springfield.''

This would indicate that passengers coming in from North Arkansas who made complaint, in some instances, had another way of reaching their destination equally convenient.

Number 10 was a through train running on a fast schedule. It carried a great many passengers, a hundred or more at a time. Those were the people who would be very likely to grumble at any interference with their fast schedule, and their complaints, very likely, would far exceed in volume the complaints of others on account of failure to stop the train.

The Commission seemed to give weight to the fact that the train did stop at Neosho during the time of Government operation. We fail to find from the record how that affected the schedule, or how the passenger traffic at that time compared with the traffic in peace times. The fact that the Government saw fit to stop the train there during the war time should have no effect upon the determination of this case, because it must be determined by the facts as we find them and applied to the conditions at the time of the hearing.

We conclude that the order to have Train No. 10 stop at Neosho, as demanded by complainant, would be an unlawful interference with interstate commerce and not justified by the demands for local accommodation.

The judgment of the circuit court, therefore, is reversed and the cause remanded with directions to enter an order setting aside the order of the Public Service Commission requiring Train No. 10 to stop at Neosho. All concur.