[S. F. No. 18667.   In Bank.   Aug. 14, 1953.]

SOUTHERN PACIFIC COMPANY (a Corporation), Petitioner, v. PUBLIC UTILITIES COMMISSION, etc., et al., Respondents.

George L. Buland, E. J. Foulds, James E. Lyons, Robert L. Pierce and Charles W. Burkett, Jr., for Petitioner.

Everett C. McKeage, Roderick B. Cassidy and Harold J. McCarthy for Respondents.

SHENK, J.—This proceeding was brought by Southern Pacific Company to review an order of the Public Utilities Commission.

On April 15, 1950, the company filed an application with the commission for the approval of its proposal to discontinue the operation of its midday passenger trains, "The Statesman" and "The Governor," running between Oakland Pier and Sacramento. The approval was sought on the ground that these "passenger trains do not handle sufficient business to justify their continued operation and that due to other services available, the public will suffer no substantial, if any, inconvenience by their discontinuance." A public hearing on this application was held on July 6, 1950, and the matter was submitted.

On September 27, 1950, the commission reopened the matter for further hearing, and also ordered, on its own motion, as authorized by section 705 of the Public Utilities Code, an investigation into the adequacy of the company's passenger train service "between various sections of the state, and particularly between San Francisco and Sacramento, and points intermediate thereto, and between San Francisco, Sacramento and points on its San Joaquin Valley and Coast lines, including local service between San Francisco and San Jose and points intermediate thereto."

This order stated that the commission had received numerous complaints charging insufficiency and inadequacy of the service afforded by the company, including the service between San Francisco and Sacramento and intermediate points, and

that the application for discontinuance of "The Statesman" and "The Governor" should not be determined without further study for the purpose of inquiring whether improvement in service and economies of operation might be effected to justify continued operation of those trains and the inauguration of sufficiently frequent and convenient passenger train schedules between those points. The two proceedings were consolidated. Public hearings were held on April 26, 1951, and September 20, 1951.

Pending the determination of the matter the commission's staff made a 12 months' survey and investigation of the services provided by the two trains involved and by other trains and carriers in the area in question. Based on the evidence taken at the hearings and on the investigation of its staff the commission, under date of May 13, 1952, rendered its opinion and the items of the order now under consideration. In the opinion the commission outlined the proceedings that had been taken and a portion of the evidence before it. It then concluded that the company had not justified its request for the discontinuance of the midday trains in question; that the public interest required that the use of the steam locomotive and standard railway equipment employed in the operation of those trains be abandoned and that there should be substituted in their place "modern self-propelled railway passenger cars"; that trains other than the midday trains were in need of refurbishing and modernization; and that the public interest required that the company make studies and submit to the commission certain plans designated in the order. The order consists of four items as follows:

1. That the company discontinue its midday passenger trains ("The Statesman" and "The Governor") "by the use of steam locomotive and standard railway passenger equipment and shall substitute in lieu thereof railway passenger service by modern self-propelled railway passenger cars."

2. That other trains of the company ("The Senator" and "The El Dorado") be "refurbished to a standard comparable to modern, railway passenger equipment."

3. That the company "shall make a study and prepare and submit to the commission a plan for establishment of automotive passenger service between San Francisco and its East Bay stations in Oakland and Berkeley to be operated in conjunction with its railway passenger train service"; and

4. That the company "shall make a study and prepare and

submit to the commission a comprehensive plan for modernization of its Oakland Pier passenger terminal facilities.''

A petition for rehearing was filed. Particularly applicable to item 1 it alleged that the decision ''is unlawful in that the commission has not regularly pursued its authority, has acted beyond or in excess of its jurisdiction, and has violated the rights'' of the company under the state and federal Constitutions; that the application to discontinue its midday trains was denied notwithstanding the undisputed evidence that they were being operated at a net annual loss of $105,000 or more; that there was a lack of evidence of further need for the operation of those trains, and that there was undisputed evidence of the existence of an abundance of public-carrier passenger transportation service furnished by other common carriers between the points served by those trains, and ''sufficient to meet every public passenger transportation request''; that the commission in ordering the substituted service has done so without an affirmative finding that the public interest requires it, and has completely usurped the ''role of management'' by prescribing the particular type of equipment.

With reference to item 2 the rehearing was sought on the ground that it pertained to the equipment of trains other than midday trains not sought to be discontinued, and as to which no findings were made by the commission to support the order.

Item 3 was objected to on the ground that it was made without notice or opportunity to be heard on the subject, and without evidence or findings to support it as required by law.

Item 4 was challenged also on the ground that it was made without notice or an opportunity to be heard and without findings to support it.

The petition for a rehearing was denied but the commission modified the decision by supplementing its findings to meet the contentions of the company in the petition for rehearing. It was found that public convenience and necessity required that the midday passenger service between San Francisco and Sacramento be continued, that ''the service, equipment and facilities, now being furnished, used and employed, are inadequate and insufficient,'' and that an improvement in such service is required; that the company has not discharged its public duty in that it failed to provide the improvements in service required, having the ability so to do; that the improvements in service, equipment and facilities required will not constitute an undue financial or other burden upon the com-

pany; and that public convenience and necessity require that the investigations and reports ordered by the commission be made by the company and submitted to the commission; that the "operations, service, equipment and facilities concerning which said studies and reports are to be made are inadequate and insufficient and that public convenience and necessity requires the improvement thereof."

The items in the order will be considered separately as enumerated. As to item 1 the company reiterates its contention that in refusing to authorize the discontinuance of the midday passenger service between Oakland Pier and Sacramento, and in requiring a change in equipment for that service, the commission has exceeded its authority; that its action is not supported by and is contrary to the evidence; that its action is arbitrary and unreasonable and deprives the company of its property without due process of law, and that the action of the commission is an unauthorized burden on interstate commerce.

The power of the commission to act in the premises and the scope of review by this court are again brought into question and sought to be examined. These questions have been determined, it would seem, with sufficient particularity and clarity; however, they will again be briefly stated.

It is provided in section 23 of article XII of the state Constitution that the commission shall have and exercise such jurisdiction to supervise and regulate public utilities in this state "as shall be conferred upon it by the Legislature, and the right of the Legislature to confer powers [upon the commission] respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution."

Referring to the reorganization of the commission in 1911 this court said in *San Diego etc. Ferry Co.* v. *Railroad Com.*, 210 Cal. 504 [292 P. 640] (in 1930 and before the amendment of section 67 of the Public Utilities Act in 1933, hereinafter noted), at page 509: "The administration of the new law was placed in the hands of the Railroad Commission [now called Public Utilities Commission], unhampered and uncontrolled by court interference except to a specified and limited extent. Section 67 of the Public Utilities Act, with reference to the powers of this court, provides in part: 'The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any

right of the petitioner under the Constitution of the United States, or of the state of California. The findings and conclusions on questions of fact shall be final and shall not be subject to review; such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination. . . . No court of the state (except the Supreme Court to the extent herein specified) shall have jurisdiction to review, reverse, correct or annul any order or decision of the commission. . . .' In *Clemmons* v. *Railroad Com.*, 173 Cal. 254, it was said at page 258 [159 P. 713], that 'the legislature might have withheld from the courts of the state any power of reviewing the acts of the commission. (*Pacific Tel. & Tel. Co.* v. *Eshleman*, 166 Cal. 640 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A.N.S. 652].) The power to review which is given must be exercised within the limits and upon the conditions which the legislature has seen fit to fix.' In *Oro Electric Corp.* v. *Railroad Com.*, 169 Cal. 466, this court said at page 471 [147 P. 118]: 'The validity of section 67 of the Public Utilities Act, in so far as it limits the scope of review by state courts of the acts of the commission, must be regarded as finally settled by the telephone company case. By that section, the findings and conclusions of the commission on questions of fact are made final and not subject to review. Here the commission found the ultimate fact that the public convenience and necessity did not require the exercise of the privileges in controversy, and neither the sufficiency of the evidence, nor the soundness of the reasoning, upon which that finding was based, can be considered on this proceeding.' Again, referring to said section 67, it was said in *Sexton* v. *Atchison, etc. Ry Co.*, 173 Cal. 760 [161 P. 748]: 'The clear intent of the provision as a whole is to place the commission, in so far as the state courts are concerned, in a position where it may not be hampered in the performance of any official act by any court, except to the extent and in the manner specified in the act itself.' (See, also, *Truck Owners & Shippers, Inc.*, v. *Superior Court*, 194 Cal. 146 [228 P. 19])."

Language found in the opinion of the Supreme Court of the United States in *Ohio Valley Water Co.* v. *Ben Avon Borough*, 253 U.S. 287 [40 S.Ct. 527, 64 L.Ed. 908], apparently was responsible for some apprehension concerning the sufficiency of the court review provided by our statute when federal constitutional questions were involved, and that due process required the further independent judgment of this

court in such cases on both the law and the facts. Accordingly the Legislature in 1933 amended section 67 of the Public Utilities Act (Stats. 1933, p. 1157; now Pub. Util. Code, § 1760, enacted 1951). That section as amended reads as follows:

"In any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the Constitution of the United States, the Supreme Court shall exercise an independent judgment on the law and the facts, and the findings or conclusions of the commission material to the determination of the constitutional question shall not be final."

The construction, scope and application of the amended section first came before this court in 1936 in *Southern Calif. Edison Co.* v. *Railroad Com.*, 6 Cal.2d 737 [59 P.2d 808]. It was there held that the amendment did not have the effect of changing the powers and duties of the commission or of this court theretofore existing in the consideration of questions arising under the federal Constitution. It was also held that the Legislature did not intend by that amendment, even if it could so provide to transfer to this court the traditional regulatory functions of the commission; nor was it contemplated that it should have the effect of constituting the court the arbiter of disputed questions of fact in matters coming before the commission.

The purpose of the review by this court is also stated in section 1756 of the Public Utilities Code as that "of having the lawfulness of the . . . order or decision . . . inquired into and determined" and in the second sentence of section 1757 which provides: "The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State."* The inquiry under either section is obviously

---

*Sections 1756 and 1757 in full provide:

"§ 1756. Within 30 days after the application for a rehearing is denied, or, if the application is granted, then within 30 days after the decision on rehearing, the applicant may apply to the Supreme Court of this State for a writ of certiorari or review for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined. The writ shall be made returnable not later than 30 days after the date of issuance, and shall direct the commission to certify its record in the case to the court.

the same, namely, the consideration by the court of the validity of the order under applicable law.

■ Although section 1757 provides that the findings and conclusions of the commission on questions of fact shall be final, the findings and conclusions referred to necessarily are those arrived at from the consideration of conflicting evidence and undisputed evidence from which conflicting inferences may reasonably be drawn. Findings and conclusions drawn from undisputed evidence and from which conflicting inferences may not reasonably be drawn, present questions of law. In either event it is for the commission under the statute to make its findings and draw its conclusions therefrom as a basis for its order. If there is such a basis and the commission has acted within constitutional bounds, its action may not be disturbed by this court on review.

The powers expressly conferred upon the commission by the Legislature with particular reference to item 1 of the present regulatory order are set forth in section 730, 761, 762 and 763 of the Public Utilities Code, the pertinent portions of which provide:

"§ 730. The Commission shall, upon a hearing, determine the kind and character of facilities and the extent of the operation thereof, necessary reasonably and adequately to meet public requirements for service furnished by common carriers. . . ."

"§ 761. Whenever the Commission, after a hearing, finds that . . . equipment, appliances, facilities, or service of any public utility . . . are . . . unreasonable, . . . improper, inadequate, or insufficient, the Commission shall determine and, by order . . . fix . . . practices, equipment, appliances, facilities, service, or methods to be observed, furnished, constructed, enforced, or employed. . . ."

"§ 762. Whenever the Commission, after a hearing, finds that . . . improvements to, or changes in, the existing . . .

---

On the return day, the cause shall be heard by the Supreme Court, unless for a good reason shown it is continued.

"§ 1757. No new or additional evidence may be introduced in the Supreme Court, but the cause shall be heard on the record of the commission as certified to by it. The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State. The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination."

equipment, . . . facilities, or other physical property of any public utility . . . ought reasonably to be made . . . to promote the . . . convenience of . . . the public, or in any other way to secure adequate service or facilities, the Commission shall make and serve an order directing that such additions, . . . improvements, or changes be made . . . in the manner and within the time specified in the order. . . ."

"§ 763. Whenever the Commission, after a hearing, finds that any railroad corporation . . . does not run a sufficient number of trains or cars, or possess or operate sufficient motive power, reasonably to accommodate the traffic, passenger or freight, transported by or offered for transportation to it, or does not run its trains or cars with sufficient frequency or at a reasonable or proper time having regard to safety, or does not stop its trains or cars at proper places, or does not run any train or car upon a reasonable time schedule for the run, the commission may make an order directing such corporation to increase the number of its trains or cars or its motive power or to change the time for starting its trains or cars or to change the time schedule for the run of any train or car, or to change the stopping place or places thereof. The Commission may make any other order that it determines to be reasonably necessary to accommodate and transport the traffic, passenger or freight, transported or offered for transportation."

Based on an extended record the commission concluded as to the subject matter of item 1 that the midday train service with present equipment and facilities be discontinued; however, that public convenience and necessity required a continuance of such a scheduled service and that it be continued by the substitution of the modern equipment specified. In so concluding the commission took the view that the new equipment when employed would result in facilities more attractive to the traveling public, would materially expedite service between the terminal cities and would probably result in an increase in revenue. There was a division of opinion in the commission on these questions. Two of the commissioners were of the opinion that the record failed to support a finding that public convenience and necessity required the continuance of this midday service and that the substituted service would not result in increased patronage or sufficiently reduce the deficits to justify the continuance. On the question of the sufficiency of the evidence to support the finding of public

convenience and necessity the commission points out that this midday service is between the capital of the state and the great metropolitan San Francisco-Oakland Bay Area and that it serves the numerous intervening urban communities and territory with desirable midday railroad passenger train service. It took into consideration the report of the survey of its own staff, made over an extensive period. The commission also had before it evidence on behalf of numerous intervening communities protesting against the discontinuance of the service and giving their reasons therefor; also protests from public and semi-public organizations in Sacramento, Oakland, Martinez, Richmond, Dixon, Suisun, Fairfield, Elmira and other localities. Representatives of the counties of Contra Costa and Solano and various employee unions appeared in protest.

The company contends that even if there is some evidence of public convenience, which is not conceded, the evidence on the question of public necessity is undisputed and should compel a finding in its favor. It refers to the report of the commission's staff which estimates that 80 per cent of the travelers between San Francisco and Sacramento use private automobiles; 13 per cent go by bus; and the remaining 7 per cent go by rail or by plane; that despite increasing population in the area, the traffic on the company's local trains over the route has been decreasing since 1946 at the annual rate of 15 per cent; that spot checks disclosed that between 34 and 43 revenue passengers daily used the runs sought to be discontinued; that to pay expenses an increase in passenger revenue of between 58 and 128 per cent would be necessary; that U.S. Highway No. 40, connecting Oakland and Sacramento, consists for the most part of four lanes and is five miles shorter than the railroad distance between the two cities; that the running time by automobile between San Francisco and Sacramento is from one hour and 55 minutes; that the runs by the trains in question consume about two hours and 30 minutes between Oakland and Sacramento and require an additional 30 minutes for ferry connections with San Francisco; that bus transportation between the two cities requires two hours and five minutes for an express, and the slowest locals require up to three hours and 15 minutes; that airlines require less than an hour to make the flight but an estimated hour and one-half is required to travel to the airport; that in addition to its midday service the company operates two other local trains daily (not midday) between

Oakland and Sacramento; that Pacific Greyhound Lines oper-
ates about 25 busses each way daily between the two cities,
including seven nonstop runs; that Burlington Transporta-
tion Co. runs four busses each way daily; that United Air Lines
and Southwest Airways operate a total of 10 flights daily
between the two cities.

The commission points to the estimate of its staff that with
the new equipment the net annual operational deficit would
be reduced to $19,000. To this the company replies that the
new equipment would not carry mail, express or baggage, re-
sulting in a loss of $150,000 annually and that the purchase
of the new equipment would require a capital outlay of
$140,000 per car, with an added $10,000 per car for spare
parts.

█ When the question of "necessity" is presented, that
term should be given the meaning ascribed to it in *San Diego
etc. Ferry Co.* v. *Railroad Com., supra,* 210 Cal. 504, where it
was said at page 511, "The word 'necessity' must be taken in
a relative sense. The Supreme Court of Illinois has well ex-
pressed its meaning in *Wabash C. & W. Ry Co.* v. *Commerce
Com.,* 309 Ill. 412 [141 N.E. 212], where it was said: 'When
the statute requires a certificate of public convenience and
necessity as a prerequisite to the construction or extension of
any public utility, the word 'necessity' is not used in its lexi-
cographical sense of 'indispensably requisite.' If it were no
certificate of public convenience and necessity could ever be
granted. . . .' "

The company calls attention to the fact that on the financial
side the cost of continuing the operation of the trains in
question with the substituted equipment would result in the
continuation of a loss of approximately $105,000 annually,
and it is argued that for that additional reason public con-
venience and necessity does not appear.

█ Whether public convenience and necessity exist can-
not turn on the question of deficits in the operation of some
particular segment of the company's intrastate business. This
is not and cannot be seriously controverted. But the company
contends that since there have been deficits in the operation
of the midday trains, and admittedly there will be a substantial
deficit in such operation under the substituted service as
ordered, the interstate commerce business in which the com-
pany is engaged will be unconstitutionally burdened. The
company refers to and relies upon decisions of the United
States Supreme Court holding that attempts by state com-

missions to compel railroads at substantial expense to stop interstate trains at local stations were invalid as an unconstitutional burden on interstate commerce (citing *Atlantic Coast Line R. Co.* v. *Wharton,* 207 U.S. 328 [28 S.Ct. 121, 52 L.Ed. 230] ; *Chicago B. & Q. Ry. Co.* v. *Railroad Com. of Wis.,* 237 U.S. 220 [35 S.Ct. 560, 59 L.Ed. 926] ; *St. Louis & S. F. Ry. Co.* v. *Public Serv. Com.,* 254 U.S. 535 [41 S.Ct. 192, 65 L.Ed. 389] ; and referring to *Southern Pac Co.* v. *Arizona,* 325 U.S. 761 [65 S.Ct. 1515, 89 L.Ed. 1915], holding invalid a requirement of the Arizona statute limiting the length of railroad trains engaged in interstate commerce.

■ The cases so relied upon are not controlling for the reason that the railroad business here involved is entirely intrastate and there is no contention that the intrastate operations of the company as a whole are unprofitable. Where the overall operations of the railroad's intrastate service is profitable it has been rightly stated that the commission may compel the continuation of a portion of such services at a financial loss and that such requirement raises no issue under the federal Constitution (*Alabama Pub. Serv. Com.* v. *Southern Ry. Co.* (1951), 341 U.S. 341 [71 S.Ct. 762, 95 L.Ed. 1002]). The decision in that case went upon a procedural point but the majority of the court clearly and correctly announced the conclusion that a review of an order requiring performance of a particular utility service, even at a pecuniary loss, is subject to considerations quite different from those involved where the return on the entire intrastate operations of a utility are drawn into question. It has also been held that problems raised by the discontinuance of local trains ''cannot be resolved alone by reference to . . . loss in their operation but depend more upon the predominantly local factor of public need for the service rendered.'' (*Chesapeake & Ohio R. Co.* v. *Public Serv. Com. of West Virginia,* 242 U.S. 603, 608 [37 S.Ct. 234, 61 L.Ed. 520].)

Based upon the evidence before it the commission found that the company had not sustained the burden resting upon it to make out a case justifying a discontinuance of this particular service. It also found that public convenience and necessity requires the continuance of the service between San Francisco and Sacramento; that the service, equipment and facilities, now being furnished, used and employed, are inadequate and insufficient; and that the company has attempted to maintain this service ''with outmoded equipment which

was relegated to this service when it became outmoded and uneconomical in the service where it was originally used.''

This court will not attempt to resolve conflicts in the evidence on the question of public convenience and necessity nor substitute its judgment for that of the commission on a subject so peculiarly within its jurisdiction and justifiably based on the record before it. It also is not for the court to say that the commission was wrong in concluding that service with the substituted equipment may result in the benefits it has forecast and sought to achieve. The fact that the effect of the order of substitution is to a more or less degree experimental does not destroy it. If it does not work out as contemplated the commission has jurisdiction to entertain a future application concerning the same subject matter.

The company further contends that the order of substitution unlawfully usurps the function of management. As statutory authority for the order the commission points to the provisions of sections 730, 761, 762 and 763 above set out. That the language of those sections in terms specifically authorizes this kind of an order may not be questioned. They empower the commission to ''determine the kind and character of facilities and the extent of the operation thereof, necessary reasonably and adequately to meet public requests for service by common carriers'' (§ 730). By section 761 it is provided that whenever the commission, after a hearing finds that the equipment of the utility is inadequate it shall determine and by order require the proper equipment to be employed. Section 762 contains language to similar effect. And section 763 authorizes the commission, upon hearing and findings, to require adequate train service as to time schedules, equipment and transportation facilities.

In exercising the powers thus granted it may not be disputed that the commission to some extent invades the functions of management. But they are not necessarily unlawfully invaded. They are subjected to the exercise of the police power of the state in the regulation of the public utility. It is undoubtedly true that for the most part all lawful regulations of a public utility in the exercise of the police power are to some degree an invasion of the managerial functions of the utility. In the absence of such regulations the utility would be free to exercise all powers of management otherwise within the law. Without question the order of substitution of one equipment for another by a transportation company is within the field of management; but it does not follow that

as such it is necessarily outside of the field of an appropriate regulatory order.

Probably the most conspicuous example of an asserted but rejected claim of "invasion of management" on the part of this commission was when it issued an order requiring the construction of a union passenger station and terminal in the city of Los Angeles. After an extensive investigation covering a period of years the commission issued an order described by this court in the *Atcheson, etc., Ry. Co.* v. *Railroad Com.*, 209 Cal. 460, 464 [288 P. 775], as an order directing the Atchison, Topeka and Santa Fe Railway Company, the Los Angeles & Salt Lake Railroad Company, and the petitioner herein, the Southern Pacific Company, "to make and construct a union passenger station within that portion of the city of Los Angeles [describing it] together with such tracks, connections and all other terminal facilities and additions, extensions, improvements and changes in the existing railroad facilities of [the railroads] as may be reasonably necessary and incidental to the use of said union passenger station, at a cost, as estimated or suggested in said order, of approximately $10,000,000 and in substantial compliance with the plans outlined by said Commission."

A brief history of that proceeding is set forth in the opinion of this court, the judgment in which was affirmed by the Supreme Court of the United States in *Atchison, T. & S. F. Ry. Co.* v. *Railroad Com. of Calif.* (1931), 283 U.S. 380 [51 S.Ct. 553, 75 L.Ed. 1128]. There as here it was contended that the construction of a union station with the manifold details and specifications prescribed was "a matter of business policy and management and not a proper subject for control under the police power of the state." That case involved the validity of an order of the commission requiring the abandonment of widely separated railway stations, terminals, tracks, and facilities, and the substitution of a centrally located union passenger terminal. The final decisions in that case are conclusive on the question of the power of the commission to order the substitution in the present matter.

From the foregoing it is concluded that in making the order contained in item 1 the commission has acted within constitutional bounds and has regularly pursued its authority.

In its petition for rehearing before the commission the company objected to item 2 of the order requiring a refurbishing of the trains "The Senator" and "The El Dorado" on the ground that it was void for lack of findings to support

it and that if findings had been made the order would so completely invade the field of management in specifying "such details as the kind of seats and the type of floor covering" as to render it invalid. In its modification of the order in denying the petition for rehearing the commission supplied the findings. Although the petition for the writ includes this item in its prayer for annulment the company later indicated its compliance with the order. It therefore becomes unnecessary to discuss the question of its validity or do otherwise than to affirm it.

Item 3 is objected to on the ground that it is beyond the scope of the investigation instituted by the company and that the terminal facilities mentioned in the order are condemned as inadequate without notice or hearing. To repeat, this order requires that the company "shall make a study and prepare and submit to the commission a plan for establishment of automotive passenger service between San Francisco and its East Bay stations in Oakland and Berkeley to be operated in conjunction with its railway passenger train service."

█ If this order had the effect of requiring a substitution of bus service for ferry service between San Francisco and the company's East Bay terminal it would be void for lack of notice, hearing, and evidence to support it. That such an order was not within the original scope of the proceeding may not be disputed. That there was no notice of hearing on this subject may likewise not be disputed. It is also true that there is insufficient evidence in the record to support the finding of inadequacy and insufficiency of the service and present equipment. However widespread asserted general complaints may be concerning the inadequacy of the present equipment and service, those complaints may not serve as the basis for a finding of the commission on the subject, much less as support for an order of substitution of bus for ferry service. Notice and hearing, or an opportunity to be heard, are prerequisites to a finding on such a subject. So-called judicial notice on the part of the commission of conditions with respect to the necessity for such a regulatory order cannot take the place of evidence regularly received and the necessary findings to support it. But that is not to say that the commission may not of its own motion institute proceedings to investigate the subject matter based upon complaints, informal or otherwise, or its general knowledge of the conditions pertaining to the service of a utility under its jurisdiction. The company was justified in objecting to

this item of the order as based upon a finding of inadequacy of present facilities was made without notice and hearing.

But it is not necessary to annul item 3 because of the lack of support for the findings complained of. The order is not one of substitution of bus for ferry service. It is an order that the company make a study and prepare and submit a plan with the end in view that such substitution may be made if and when, after appropriate notice, hearing, and findings, some such plan be put into effect. In its present form this item cannot be deemed a final order. It is plainly preliminary and as such is within the jurisdiction of the commission to make on its own motion. The findings required by the statute are not necessary to support it and the findings made on this subject should be disregarded.

The same conclusion applies to item 4 which requires the company "to make a study and prepare and submit to the commission a comprehensive plan for modernization of its Oakland Pier passenger terminal facilities." The purported findings of the commission on this subject made on consideration of the petition for rehearing were an obvious endeavor to support this item of the order. They were made without notice or hearing, are ineffective, and should be disregarded. This item of the order was also preliminary and needed no findings as required by the statute to support it.

As above considered and construed the order and each item thereof is affirmed.

Gibson, C. J., Carter, J., Traynor, J., and Spence, J., concurred.

EDMONDS, J.—Under certain circumstances, the Public Utilities Commission may compel the continuation of operation of a segment of service at a loss, when justified by public convenience and necessity, and it has broad powers in regard to train schedules and deployment of equipment. However, I do not find in the record here presented any evidence to support that portion of the order requiring the extensive capital outlays which the railroad must make to comply with it.

The sole reference to the use of Budd Diesel cars to supplant the petitioner's present equipment appears in the reports of the commission's experts. There the new trains are suggested as one of several possible alternatives to the present service, all of which are characterized as unsatisfactory in re-

ducing operational deficits. Although, as stated, "this court will not attempt to resolve conflicts in the evidence," there must be some evidence of public necessity and convenience to support an order which admittedly requires the expenditure of hundreds of thousands of dollars to establish a new type of service to be operated at a loss.

For these reasons, I would annul that portion of the order requiring the use of "modern self-propelled railway passenger cars" on the Sacramento midday runs.

Petitioner's application for a rehearing was denied September 10, 1953. Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.