By the Court.
 

 The plaintiffs in error, two railway corporations, applied to- the Public Utilities Commission for authority to discontinue four trains carrying passengers, mail, and express between Cincinnati, Ohio, and Jackson, Mich. Each of these trains consisted of two cars operated by electric motive power; one of the cars carrying an electric engine and space for mail, baggage, and express, the other being a coach seating about 64 passengers. This was a joint operation of the trains by the two
 
 *569
 
 companies, the Cincinnati Northern operating north and south from Jackson, Mich., to Franklin, a junction point in Ohio, the other railway company, connecting therewith, operating trains north and south from said junction point to Cincinnati, Ohio. Protests against the discontinuance of the service were filed hy various interested parties and communities. The commission finding that the entire operations were profitable, and that the service sought-to be discontinued was necessary for the public welfare, denied the applications of both companies. Thereupon the applicants prosecuted error to this court.
 

 The chief ground of complaint urged by the railway companies is that, since the operation of these small trains between Cincinnati, Ohio, and Jackson, Mich., was so unprofitable as to cause a large out-of-pocket loss to the companies, the order of the commission refusing to discontinue their service was unlawful and unreasonable. The commission, although admitting that there was heavy loss from the operation of these trains between Cincinnati, Ohio, and Jackson, Mich., was of the opinion that, in view of the fact that the entire operation of the plaintiffs in error’s railways as a whole was profitable and annual dividends had been paid by the railway companies, the continued operation of these small motor trains should be maintained.
 

 The reason for its refusal to discontinue service is disclosed in the following paragraph of the opinion of one of the commissioners: “The showing of this particular company is very satisfactory; to show a net profit of ten per cent, of course is satisfactory. Notwithstanding this fact, it does show that these four trains are operated at a loss. I am
 
 *570
 
 not prepared to say exactly what that loss is now, bnt better than $30,000.00 as a direct loss. '* * * And inasmuch as the railroad company as an entity is operating at a profit that should be satisfactory to any company, we hesitate to permit the withdrawal of any service that seems to be so indispensable to the life of smaller industries as this evidently is. * * * I call especially the attention of the railway company to the business at Cold-water. There is an enterprise that does, according to the testimony, a six million dollar business, and they must have the mail service and they must have the express service and they must have the parcel post service in order to give that other business a chance to develop.” It is very evident from the last clause of the opinion that the chief reason for the commission’s refusal to discontinue service was that the communities along the line of railway, and especially the enterprise at Coldwater, would not receive convenient and proper mail, express, and parcel post service if the trains were discontinued.
 

 It is urged by counsel for the carriers that it was no part of their public duty to carry mail and express, as they were carried under private contract, that, therefore, consideration should not be given such service in the determination of their application.
 

 Section 504-3, General Code, applies to every service and facility in which a railway company, exercising its franchise obtained from the state, is engaged as a common carrier, and it is not limited simply to the carriage of passengers and freight.
 
 Adena Rd. Co.
 
 v.
 
 Public Service Commission,
 
 92 Ohio St., 1, 110 N. E., 631;
 
 Chesapeake Ohio Ry.
 
 
 *571
 

 Co.
 
 v.
 
 Pub. Serv. Comm.,
 
 242 U. S., 603, 37 S. Ct., 234, 61 L. Ed., 520.
 

 So long as these utilities continue to be common carriers they are subject to the jurisdiction of the commission, whether they operate under scheduled rates or whether they carry mail and express under so-called private
 
 contracts;
 
 so long as they do carry mail and express the carriage is for the benefit of the public, and the emoluments received therefrom may be considered as a component part of their earning power. In this case had the earnings derived from mail and express been sufficient to sustain the entire business of carriage as a whole over the line in question, it could not be urged by the companies that they were operating at a loss.
 

 The chief question presented is whether, although the railroad company as an entity was found to be operating at a profit, the particular service under consideration should be discontinued, where it is shown that “better than $30,000.00 as a direct loss” had been incurred during the previous sixteen months as a result of that service.
 

 Where abandonment of service is involved, said Section 504-3, General Code, provides that the commission shall ascertain the facts, “and if such facts satisfy the commission that the proposed abandonment, withdrawal or closing for traffic or service is reasonable, having due regard for the welfare of the public and the cost of operating the service or facility,” the commission may allow the same.
 

 Speaking of the duties imposed upon a carrier obtaining and exercising a franchise acquired from the state, this court held: “The fact that some loss would result from compliance with the latter
 
 *572
 
 does not in and of itself conclusively establish, the unreasonableness of the order, but is an important element to be considered with all the other facts bearing on that question.”
 
 Hocking Valley Ry. Co.
 
 v.
 
 Public Utilities Commission,
 
 92 Ohio St., 9, 110 N. E., 521, L. R. A., 1918A, 267, Ann. Cas., 1917B, 1154.
 

 In
 
 Chesapeake & Ohio Ry. Co.
 
 v.
 
 Pub. Serv. Comm.,
 
 242 U. S., 603, 607, 37 S. Ct., 234, 236 (61 L. Ed., 520), Mr. Justice Van Devanter, speaking for the court, said: “One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss.
 
 Atlantic Coast Line Railroad Co.
 
 v.
 
 North Carolina Corporation Commission,
 
 206 U. S., 1, 26 [27 S. Ct., 585, 51 L. Ed., 933, 11 Ann. Cas.,
 
 398]; Missouri Pacific Ry. Co.
 
 v.
 
 Kansas,
 
 216 U. S., 262, 279 [30 S. Ct., 330, 54 L. Ed., 472];
 
 Oregon Railroad & Navigation Co.
 
 v.
 
 Fairchild,
 
 224 U. S., 510, 529 [32 S. Ct., 535, 56 L. Ed., 863];
 
 Chicago, Burlington & Quincy R. R. Co.
 
 v.
 
 Wisconsin Railroad Commission,
 
 237 U. S., 220, 229 [35 S. Ct., 560, 59 L. Ed., 926]. That there will be such a loss is, of course, a circumstance to be considered in passing upon the reasonableness of the order, but it is not the only one. The nature and extent of the carrier’s business, its productiveness, the character of service required, the public need
 
 *573
 
 for it, and its effect upon the service already being rendered, are also to be considered.”
 

 Section 504-3, General Code, provides that the commission may allow the withdrawal of service if such withdrawal is reasonable, “having due regard for the welfare of the public and the cost of operating the service.” The reasonableness of the commission’s order must necessarily be bottomed upon the peculiar facts developed in each particular case. The fact that incidental loss is incurred in the furnishing of the facility is an important criterion, to be considered in connection with the whole productive business of the carrier, and also in connection with the public need for the performance of the latter’s duty under its franchise obligations to the state.
 
 Atlantic Coast Line case, supra.
 

 It appears that from 1923 to 1927, because of competition by bus and private automobile, the operating revenues of the railway companies continued to decline annually. While a small revenue was derived from transportation of baggage and milk, substantially the whole of it was obtained from the carriage of passengers, mail, and express,- the mail and express revenues averaging a little more than 40 per cent, of the entire earnings. The commission concedes that during the year 1927, and the first four months of 1928, these small trains were operated at a loss of about $30,000; in fact, the loss was a little in excess of $31,000. The record further discloses that, while these operating revenues declined in the years preceding, they continued to decline during the first four months of 1928. Over much the greater part of the line there was an operating net loss of about 24 cents per train mile to the
 
 *574
 
 Cincinnati Northern Company, anjd a loss, also, though much less, was sustained by the other railway. Since the passenger service was relatively small the commission was of opinion, and stressed the fact, that “due regard for the welfare of the public” required the continuance of mail and express service, notwithstanding the large cost of furnishing the service and the net loss occasioned to the carrier thereby. Many of the larger communities along the line of the Cincinnati Northern are served at junction points by other railways running east and west. The protestants have shown that some of them will suffer great inconvenience and trade disadvantage by the abandonment of schedule service in parcel post, mail, and express deliveries, especially to points north and south. This is especially true of the large industry at Coldwater, mentioned in the commission’s finding, although that industry has the Nickel Plate Railway at the Cold-water junction. There is evidence in the record, however, that if the present service were abandoned traffic facilities for mail and express might be secured by truck, or otherwise, which would in a great measure compensate that industry and many of the communities affected for the inconvenience and disadvantage suffered by reason of the withdrawal of those facilities. Under the circumstances here developed, when all things are considered, and having due regard both to the public welfare and the cost of service, we are of the opinion that the cost of providing the service imposes too large a pecuniary burden upon the railway companies, and that upon the whole the enjoyment of these facilities by the
 
 *575
 
 public is not commensurate with tbe cost necessary to supply them.
 

 Tbe order of tbe commission refusing tbe application for abandonment of service is unreasonable, and its order is reversed.
 

 Order reversed.
 
 „
 

 Marshall, C. J., Kinkade, Robinson, Jones, Day and Allen, JJ., concur. Matthias, J., not participating.