Stephenson, J.
 

 There is but one question before us, namely, Was the refusal of the Public Utilities Commission of Ohio to grant authority to the railroad company to discontinue the service of its two remaining passenger, mail and express trains unlawful and unreasonable?
 

 There is violent dispute as to what the record herein tends to prove. The railroad company insists:
 

 “There is no evidence that any dividends are being paid on the stock of the Cincinnati Northern Railroad Company, nor of any amount thereof. There is no evidence of estiniated population of surrounding territory. * * * There is no evidence that the Cincinnati Northern is operated as a part of the Big Four system, or of the territory served by or schedules of the Big Four system or that through passenger trains are run over that line. There is no evidence of any
 
 *384
 
 connection or failure thereof at Hudson, Michigan, or Jackson, Michigan. There is no evidence of the Big Four schedule through Ansonia. There being no evidence of schedules of other railroads, there is not and cannot be any evidence to sustain the contention that the Cincinnati Northern schedule is designed to fail to make connections or to fail to operate as a feeder to other trains. There is no evidence that the operation of Cincinnati Northern Railroad Company is profitable. Consequently there is no basis for counsel’s contention that where an operation is profitable as a whole, the railroad must continue to operate a portion at a loss.
 

 ‘ ‘ There is no evidence that the lowest point of financial depression was during 1933. ’ ’
 

 The railroad company further insists that in the cost figures detailed by defendant in error, “The cost of steam relief train expense for the years 1931 and ’32 have not been included and therefore the cost, as shown in the brief, for those years should be increased $9,609 for 1931 and $1,763 for 1932. There is no evidence to support the claim that the railroad did not decrease its operating costs as the depression became more severe. On the contrary the record is clear that the Railroad Company did everything in its power to. decrease operating expense. The statement * * * that plaintiff in error attempted to charge as part of the costs of operating the motor trains, some amount for the antiquated coaches and idle engines at division points is not supported by the evidence. The evidence * * * shows that if a motor train breaks down, the
 
 closest
 
 engine is called upon to haul it to a terminal. If unable to operate the next day, then the steam relief equipment is called into service. There is no evidence that the ‘closest engine’ is ‘idle.’
 

 ‘ ‘ There is no evidence that the trailers used on motor trains are ‘ old, antiquated coaches that cannot be used on the main line.’ ”
 

 “There is not a syllable of evidence to support the
 
 *385
 
 unwarranted claim made by counsel that a change in schedules on the Cincinnati Northern was made so that direct service to Cincinnati is impossible. The record is silent as to counsel’s travel necessities, or how he goes to and from places he sees fit to visit. ^ There is no evidence that the mail throughout the country for 1933 fell off because of 3-cent postage.”
 

 We cannot agree that the record is silent on all these propositions. We do agree that some of the conclusions drawn therefrom may be in a measure fantastic. It must be conceded that the operation of the two trains in question is a money-loser for the railroad company, but it has not as yet arrived at the confiscatory stage.
 

 Plaintiff in error insists that the affected public is interested but little in the discontinuance of passenger service, but that it is concerned in the abandonment of the mail and express service. Be that as it may, a general remonstrance has been interposed and the discontinuance of the passenger service was an issue before the Public Utilities Commission.
 

 The Public Utilities Commission of Ohio is a creature of statute. Its power to hear and determine the applications of public utilities to discontinue an established service is delegated by Section 504-3, General Code, namely:
 

 “* * * Upon the hearing of said application said commission shall ascertain the facts, and malee its finding thereon, and
 
 if such facts
 
 satisfy the commission that the proposed abandonment, withdrawal or closing for traffic or service is reasonable, having due regard for the welfare of the public and the cost of operating the service or facility, they may allow the same; otherwise it shall be denied, or if the facts warrant, the application may be granted in a modified form. * * *” (Italics ours.)
 

 In passing, we note that plaintiff in error complains that the order made herein was not signed by the chair
 
 *386
 
 man of the commission. We attach but little importance to that feature, inasmuch as the substance of the order is attacked.
 

 The case of
 
 Cincinnati Northern Rd. Co.
 
 v.
 
 Public
 
 Utilities;
 
 Commission, supra,
 
 is relied on by plaintiff in error as being decisive of this case.
 

 We cannot agree that these cases are on all fours with each other. In the
 
 Cincinnati Northern Rd. Co. case
 
 the commission found that the railroad company was a heavy loser by reason of the operation of six daily trains. This court ordered the discontinuance of four daily trains in that case. That was all that the railroad company asked for, but after that application was granted there still remained in operation on the road the two trains now sought to be discontinued. That case was heard in 1929 and involved the years 1923,1924, 1925, 1926, 1927 and 1928. During those years we were riding the crest of the wave of prosperity, and if any particular service of a railroad company was losing money during those years it could not hope to stem the financial tide. The application in the instant case deals with the years 1931,1932, 1933 and a part of the year 1934.
 

 It is too well settled to require citation of authority that courts take judicial cognizance of the times. During the years of 1931, 1932, 1933 and that part of 1934 referred to by plaintiff in error, we were in the throes of the worst financial disaster this country has as yet experienced. Public utilities were not the only concerns that were operating at a loss. Individuals, partnerships, corporations, public and private, were taking their losses during those years, and many concerns are still taking them. We are not unmindful that it may seem somewhat harsh to require a railroad to operate any branch of its service at a loss and we are likewise aware that this court in the case last referred to held in substance that, notwithstanding the railroad company during the time complained of was operating at
 
 *387
 
 a profit, nevertheless, if the passenger, mail and express service was being operated at a loss, such service should be discontinued
 
 pro tanto
 
 — and it was — but the court in that case was not asked to take from the public, that had theretofore been served by the public utility, the last vestige of passenger, express and mail service.
 

 As per request of counsel we have taken the
 
 Cincinnati Northern Rd. Co. case, supra,
 
 as a citation digest and considered the long line of cases therein noted. We have likewise considered the applicability of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 19, of the Constitution of Ohio, and the cases cited which it is claimed support the theory that the order of the commission made in this case takes the property of the railroad company without due process. We just cannot see where due process is denied herein. Let us not forget that the railroad company owes some duties to the public as a common carrier.
 

 It is for this court to say from the record in this case whether the commission’s order made herein was unlawful or unreasonable. We will advert again to the
 
 Cincinnati Northern Rd. Co. case, supra,
 
 wherein the court says, at page 573:
 

 “The reasonableness of the commission’s order must necessarily be bottomed upon the peculiar facts developed in each particular case.”-
 

 We will examine cursorily the facts in this case. Plaintiff in error is now operating over this route two gasoline powered, electric motor cars containing space for baggage, mail and express and a trailer for passengers. This is indisputably the most economical type of equipment. On the basis of thev operation of this equipment, plaintiff in error contends that it sustained losses as follows:
 

 
 *388
 
 1931 ............................$27,229.00
 

 1932 ............................ 30,641.00
 

 1933 ............................ 30,952.00
 

 Total Loss for Three Year Period. .$88,822.00
 

 It is contended by the commission, and the record bears it ont, that plaintiff in error in calculating these losses included in its operating cost items for repairs and depreciation to its motor cars in such amounts that the equipment has been preserved in excellent condition for operating purposes, while at the same time a depreciation reserve of approximately ninety per cent for such equipment was set up. The only break-down figures presented by the railroad company cover the eleven months period from April 1, 1933, to February 28, 1934. In the operating costs for that period were included expenditures of $11,615 as repairs to motor cars and trailers, and the sum of $7,582 for depreciation. The original cost of these motors was $39,384 each, and the cost of trailers was $5,868. Total cost for motors and trailers was $90,504.
 

 On this basis for the nine years that this equipment has been, in use, approximately $99,000 has been expended in repairs, and much of this amount was undoubtedly expended for replacement. The commission contends that the railroad company during this time charged off through depreciation reserve in excess of $70,000, or almost ninety per cent of the initial cost of the equipment. This may not be mathematically correct, but it is not so far wrong as to merit criticism. When all these figures are considered, it does seem that the railroad company is more scared than hurt.
 

 It is manifest, from the number of protests filed herein, that the general public served by this utility feels that there is a real need for the continuation of
 
 *389
 
 the service. The territory served is populous and, in ordinary times, most prosperous. In most of the communities involved herein, the service sought to be discontinued is the only rail service they have.
 

 The railroad company offers, in the event that its application is granted, to substitute a truck service for the mail and express. There is testimony in the record tending to show that such proposed service would be not only unsatisfactory but wholly inadequate.
 

 There is likewise testimony in the record tending to show that the railroad company’s passenger business could be materially increased by a readjustment of schedules.
 

 Let us look at this picture from another angle. This is the only mail, express and passenger train service seventeen towns, with an aggregate population of more than 10,000, have, and there is testimony in the record that thousands in the communities adjacent to those towns are likewise affected. This is the only service they have had for several years. They have grown to rely on it. They have adjusted themselves and their respective businesses to a greater or lesser extent to such service. Many have doubtless expended dollars for betterments that would not have been so expended but for such service. True, there is no testimony along this line, but is it not only a logical but a natural conclusion? These people feel that they would be hurt, else they would not be protesting. The loss in dollars to the railroad company must be considered in the light of the public inconvenience. It will be borne in mind that the railroad company will continue to enjoy its franchise after the order to discontinue is made— if made.
 

 This court has held, in effect, that the mere fact of loss, while an important element to be considered with all other facts bearing on the question, is not in and of itself sufficient to conclusively establish the unreasonableness of an order of the Public Utilities Commis
 
 *390
 
 sion.
 
 Hocking Valley Ry. Co.
 
 v.
 
 Public Utilities Commission,
 
 92 Ohio St., 9, 110 N. E., 521, L. R. A., 1918A, 267, Ann. Cas., 1917B, 1154. To the same effect is the ease of
 
 Chesapeake & Ohio Ry. Co.
 
 v.
 
 Public Service Commission of West Virginia,
 
 242 U. S., 603, 37 S. Ct., 234, 61 L. Ed., 520.
 

 Mr. Justice Van Devanter, in passing on this case, at page 607 thereof, said:
 

 “One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the State and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss. * * * That there will be such a loss is, of course, a circumstance to be considered in passing upon the reasonableness of the order, but it is not the only one. The nature and extent of the carrier’s business, its productiveness, the character of service required, the public need for it, and its effect upon the service already being rendered, are also to be considered.”
 

 The case of
 
 New York Central Rd. Co.
 
 v.
 
 Public Utilities Commission,
 
 123 Ohio St., 560, 176 N. E., 219, in no wise changes this rule.
 

 Under the broad powers granted the Public Utilities Commission of Ohio by Section 504-3, General Code, we are unable to say from the record in this case that its order was unlawful or unreasonable, and the order as made is hereby affirmed.
 

 Order affirmed.
 

 Weygandt, C. J., Williams and Zimmerman, JJ., concur.
 

 Matthias, J., not participating.