By the Court.
 

 The sole question presented is whether the finding and order of the Public Utilities Commission were manifestly against the weight of the evidence and therefore unreasonable or unlawful.
 

 Section 544, General Code, provides that: “A final order made by the commission shall be reversed, vacated or modified by the Supreme Court on appeal, if upon consideration of the record such court is of the opinion that such order was unlawful or unreasonable.”
 

 So much of Section 504-3, General Code, as is here pertinent, dealing with applications for abandonment filed with the Public Utilities Commission, provides that: “Upon the hearing of said application said commission shall ascertain the facts, and make its finding
 
 *77
 
 thereon, and if such facts satisfy the commission that the proposed abandonment, withdrawal or closing for traffic or service is reasonable, having due regard for the welfare of the public and the cost of operating the service or facility, they may allow the same; otherwise it shall be denied, or if the facts warrant, the application may be granted in a modified form.”
 

 The commission omitted to file with the record of the case a written opinion, setting forth the reasons which prompted the decision, or a resume of the facts from the record upon which the decision was based, as required by the provisions of Section 61446a, General Code. However, the attorney examiner who heard the testimony filed with his report thereof a resume of the evidence and a finding of facts, which was adopted by the commission and reads as follows:
 

 “The applicant has complied with the commission’s order with respect to notice to prosecuting attorneys and mayors. Trains 604 and 605 are being operated by the applicant at a substantial loss. • Adequate passenger transportation by means of bus and remaining trains will be afforded territory involved. A comparable mail and express service can be established to make connections with trains for points off line. Public convenience will not be impaired by removal of trains 604 and 605.
 

 “Recommendation: Application be granted.”
 

 The evidence of applicant, the Pennsylvania Railroad Company, as disclosed by the record, shows that these trains are being operated at a loss; that the income therefrom for the twelve-month period, beginning September 1937 and ending August 1938, was $43,-278.32; that the operating expense incurred during that period amounted to $72,524.72; and that the loss for this twelve-month period amounted to $29',246.40.
 

 The evidence shows that in computing the income applicant included revenues from passenger haul, excess baggage, mail, express, milk, and income from
 
 *78
 
 other passenger trains. Applicant did not, however, include as income all revenues arising on the road here involved which were allocated to other divisions of the railroad, and it was admitted that these trains were responsible for more revenue than that with which they were credited.
 

 In computing the expenses, applicant included the cost of operating the gas-electric car and the steam operated trains which were from time to time substituted for the gas-electric car.* These expenses embraced servicing, inspection, running repairs to equipment, interest, insurance and depreciation, but did not include any charge to the equipment for the overhead expense of keeping up the right-of-way. The net loss for this period is claimed to be $29,246.40.
 

 Protestants object to the figures supplied by the company with respect to the expense of operating the trains here involved. They argue, in substance, that in a number of instances the expenses testified to were, not actual but theoretical, ascertained through the use of a formula devised by the United States Interstate Commerce Commission, and intended for the ascertainment of operating expense of first class passenger trains; that since the two trains here involved are by no means first class, the formula is not here applicable, and that the expense charged against them is consequently in excess of the actual expense incurred.
 

 While the amount of the pecuniary loss is contested, it may be inferred from the evidence introduced that the operation of the two trains here involved is accompanied by some loss. However, that fact does not, in and of itself, warrant the Public Utilities Commission of Ohio to authorize the abandonment of the service.
 
 New York Central Rd. Co.
 
 v.
 
 Public Utilities Commission,
 
 129 Ohio St., 381, 195 N. E., 566. That fact, although important, must be considered in the light of the public need for the service — an element which should receive paramount consideration.
 

 
 *79
 
 Where the evidence discloses such public need, a public utility will not be relieved, by consent to abandon, from the performance of its legal duty to render the service, notwithstanding the fact the furnishing of such service is accompanied by a pecuniary loss, except in eases where the entire record discloses the loss to be such as to make abandonment of the service not merely expedient, but, under the circumstances, so imperative that the loss far outweighs the paramount consideration of the public need for the service.
 

 With respect to public need, the record discloses that upon the abandonment of trains 604 and 605, the villages of Clinton, Warwick, Marshalville, Apple Creek, Fredericksburg, Holmesville, Killbuck, Glenmont, Brink Haven, Danville, Howard, Bangs, Mt. Liberty, Centerburg, Condit, Sunbury,. Galena and Westerville, communities which are now served by these trains by regular or flag stops, will be deprived of passenger train service.
 

 Applicant introduced evidence to the effect that the express and mail services now furnished by the trains in question will be replaced by substitute service, to be given by the Railway Express Company. Maps were introduced in evidence to show the highway and various bus lines which are now in operation and available to the people served by these trains. The applicant’s witnesses admitted, however, that the substitute would be
 
 IV2
 
 to
 
 1%
 
 hours longer en route each way than the present train service.
 

 Sixteen witnesses for the protestants, who live in various places along the train route, gave testimony in detail, which showed the kind of service which is now being furnished to the protestants; that they were shipping large amounts of perishable commodities over this railroad line; that these commodities consist of milk, ice cream mix, baby chicks and cut flowers; that train service is essential for the product to reach the market in good condition, and that substitute service
 
 *80
 
 would be too slow and ineffective, and would, very likely, also prove inadequate. Their testimony is summed up by the attorney examiner thus:
 

 “For the protestants, 16 witnesses appeared, half of whom were from Mt. Yernon and Millersburg. Their testimony was directed chiefly to the mail and express service, there being but little dispute as to the scarcity of passenger traffic. They expressed apprehension that an inferior service as to connections for distant points would be offered, but stated that they would be agreeable to a service that offered the same mail and express connections for distant points.”
 

 Examination of the record fails to disclose the kind of substitute service the applicant proposes to offer. No plan has been submitted showing schedules, the number of trucks, size of trucks or the frequency of operation.
 

 That a real public need exists for the train service sought to be abandoned is clear from a perusal of the record. This need is, in a sense, impliedly conceded by the fact that a substitute service is offered.
 

 The record further discloses that the highway system in no wise provides an adequate transportation service that could in any way be comparable to that afforded by the train service, for the reason there are no parallel highways, and those that do exist are frequently impassable by reason of floods, snow drifts, etc. The bus lines indicated on this map show that while direct service is available between Columbus and Mt. Vernon, there is no such service for any of the communities between Mt. Yernon and Millersburg; that people desiring to go from Millersburg and Holmesville to Columbus would be required to go to Coshocton, Ohio, and from there to Columbus, a most indirect route.
 

 In authorizing the abandonment, the majority of the commission apparently gave undue weight to the pecuniary loss sustained by applicant in the operation of the trains here involved, and gave insufficient weight
 
 *81
 
 to the testimony of the protestants with respect to the needs of the communities affected.
 

 Applicant cites the case of
 
 Cincinnati Northern Rd. Co.
 
 v.
 
 Public Utilities Commission,
 
 119 Ohio St., 568, 165 N. E., 38, wherein the railway company was allowed to discontinue four passenger trains which were being operated at a loss, notwithstanding the fact that there was considerable showing of public necessity for those trains. At first glance, it would seem that that case would support the theory of the applicant. However, in the cited ease, the communities affected were losing
 
 convenient
 
 mail and express service by railway, while in the instant case most of the communities affected are losing the
 
 entire
 
 railway mail and express service. This is not a case of mere decrease of the amount in the service furnished, but rather a complete discontinuation of train service.
 

 In the light of the record, we are of the opinion that the majority of the Public Utilities Commission gave insufficient weight to the testimony adduced by the protestants with respect to the needs of the people living in the communities affected.
 

 We hold that the action of the commission is- not supported by, but is contrary to, the weight of the evidence and is unreasonable. The finding and order of the Public Utilities Commission must therefore be reversed.
 

 Order reversed and cause remanded.
 

 Weygandt, C. J., Day, Williams and Hart, JJ., concur.