**WARM v CINCINNATI (city) et**

Ohio Common Pleas, Hamilton Co

Decided June 22, 1937

J. Louis Warm, Cincinnati, and George E. Fee, Cincinnati, for plaintiff.

John D. Ellis, Cincinnati, and Henry M. Bruestle, Cincinnati,' for the city of Cincinnati.

Harmon, Colston, Goldsmith & Hoadly, Cincinnati, for New York Central Railroad Co.

Francis C. Canny, United States Attorney, Dayton, Sam E. Whitaker, Washington, D. C., John W. Scott, Washington, D.' C., and Enoch E. Ellison, Washington, D. C.. on the briefs for the United States Government as amicus curiae.

## OPINION

By GORMAN, J.

This is an action by a taxpayer to enjoin the city of Cincinnati from issuing bonds for the purpose of carrying out its part of an agreement made on October 8, 1936 with the New York Central Railroad and John A. Jaster, director of highways of the state of Ohio.

The subject matter of the contract is for the elimination of certain grade crossings, which contract was entered into by the city of Cincinnati, Ohio, the New York Central Railroad and the director of state highways, pursuant to the provisions of §1228-1, GC, the Federal Emergency Relief Appropriation Act of 1935 and the rules and regulations adopted and approved by the secretary of agriculture of the United States, the Works Progress Administrator of the United States and the President of the United States, pursuant to the aforesaid Federal Emergency Relief Appropriation Act of 1935.

It will be noticed that neither John A. Jaster, the state director of highways, nor any of the Federal officials are made parties defendant.

On June 17, 1931, the city of Cincinnati and The New York Central Railroad Company entered into an agreement for the elimination of certain grade crossings of that railroad at 67th, 69th, 70th, 71st, 72nd, 73rd, and 74th streets, under the provisions of §8868, GC, whereby the city was to pay thirty-five per cent of the cost and the railroad company sixty-five per cent. No effective action was ever taken under this agreement, although the railroad did acquire ten parcels of land in furtherance of the plan proposed. Finally, on September 2, 1936, the council of the city of Cincinnati adopted an ordinance authorizing the city manager to release the railroad company from the obligation of this contract, in consideration of the payment of $100.000 to the city, and conveying to the city the ten certain parcels of real estate it had acquired for the purpose of carrying out the agreement of June 17, 1931.

This release was executed on October 8, 1936. In the meantime, on April 15. 1936, council of the city of Cincinnati operate with the director of state highways for the separation of the grades of the C. C. C & St. L. Railway Company, of which the New York Central Railroad is lessee, at 69th and 71st streets.

On August 5, 1936 the council passed an ordinance authorizing the city manager to execute a tri-party agreement with the state of Ohio and the New York Central Railroad on behalf of the city, providing for the elimination of these grade crossings.

This agreement was executed on October 8, 1936. It provides in part that the improvement is contemplated, being made under the provisions of the Federal Emergency Relief Act of 1935 (H. J. Resolution 117 of the 74th Congress) and §1228-1, GC. It then describes in detail how the grade crossing shall be eliminated. §3 provides that the greater portion of the work shall be let on contract by the state after competitive bidding. The state shall have general charge of and perform the engineering work on the project, but the city and railroad shall provide such special engineering services as may be required. §7 of the contract provides:

"It is understood that the project herein contemplated is to be financed from funds provided by the Federal Government and the city, and expended under Federal regulations; that all plans, specifications, estimates of costs, awards of contract, acceptance of work and procedure in general are subject at all times to all Federal laws, rules and regulations, orders and approvals applying to it as a Federal project."

The new track metal and ties entering into the permanent tracks shall be furnished by the railroad company without cost to the project. The state agrees that it will pay $635,000 for the construction, but should it exceed this amount, "the excess cost shall be borne by the city." The preliminary estimate of the total cost of construction is approximately $650,000.

It is estimated that the cost of property damage is $325,000 and shall be borne by the city.

In the agreement of September 3, 1936 the railroad company agreed to pay the city the sum of $100,000 to be used by the city as part payment for the land to be acquired. It also agreed to convey ten parcels it had acquired to the city, and that the payment and conveyance will operate as a full discharge of the contribution to be made by the company to the project.

There is no claim that there are any procedural defects in the steps taken by the state, city, railroad company or Federal Government. All of the provisions of the satutes have been complied with, but the validity of the statutes, ordinances and agreements are challenged by this proceeding.

Sec 1228-1, GC authorizes the director of highways to accept any allotment of funds made by the Federal Government under the Federal Emergency Relief Appropriation Act of 1935 in accordance with the rules and regulations issued thereunder for the elimination of grade crossings. The procedure to be employed and the plan followed is that which existed for the elimination of grades when the city and state co-operated together to do such work (§1229, GC).

It is specifically provided that "the division of expense shall be limited to only such part of the expense of such improvement as remains after the application thereto" of the funds accepted from the United States.

Provision is made for a municipality to enact legislation to carry out the improvement and to issue bonds for its portion of the cost of the improvement.

The plaintiff claims that the contract in question provides for an unlawful delegation of legislative power of the state of Ohio and the city of Cincinnati to the President and the Federal administrative officials, contrary to Article 2, §1 of the Ohio Constitution; that §§1228-1 and 17-4, GC unlawfully delegate legislative power to the President of the United States; that the Federal Emergency Relief Appropriation Act of 1935 provides for an unlawful delegation of legislative functions by Congress to the President and the Federal Administrators; that the Federal Act likewise violates the provisions of the Tenth Amendment of the Constitution, permitting a usurpation by the National Government of the reserved powers of the state; and finally that the contract provides for an unlawful lending or advancement of credit by the State of Ohio to the city of Cincinnati and the New York Central Railroad Company.

The plaintiff concedes that he could not enjoin the appropriation by the National Government in the Federal courts, as he would not have sufficient interest as an ordinary taxpayer so to do. See—Massachusetts v Mellon, 262 U. S. 447; City of Allegan v Consumers Power Co., 71 Fed. (2nd), 477; Arkansas-Missouri Power Co. v Kennett, 78 Fed. (2nd) 911, 914.

Since neither state nor federal officials are parties to this action, the question presented is whether the action of the city of Cincinnati in issuing bonds to pay its share of the cost, and expending money under the contract executed, will amount to a misapplication of funds of the city, an abuse of corporate powers, or the performance of a contract made in contravention of the laws and ordinances. (See §§4311, 4313, GC).

A taxpayer may bring an action to enjoin the issuance of bonds ii the contract for which the funds are to be raised provides for an expenditure which is illegal. **Elyria Gas Co. v Elyria, 57 Oh St 374; Cincinnati v Harth, 101 Oh St 344.** Our inquiry must therefore be directed towards the terms and conditions of the tri-party agreement executed on October 8, 1936, and the legislation which authorized its execution.

Throughout this inquiry it must be considered that the plaintiff is bringing this action as a taxpayer of the city, and not as one of the state of Ohio or of the United States. The problem is rendered difficult, however, because courts have read into the constitution so many things that were not there, and denied others which those who believe in an evolutionary view of the development of the constitution have thought were rather clearly or impliedly expressed.

It is likewise rendered more difficult by the fact that the language of the many opinions of the majority of the highest tribunal rendered within the past few years, could be cited rather effectively to uphold the contention of either the plaintiff or the defendants. This naturally leaves a lower court in somewhat of a legal fog where it can only grope and hope that its views may eventually find some accepted haven.

Counsel for all parties have relied upon many cases involving grants and loans by the federal government to municipalities to construct power plants, decided by the United States District and Circuit Courts. Among those cited for the plaintiff are Illinois Power & Light Co. v Centralia, 11 Fed. Supp., 874; Arkansas-Missouri Power Co. v City of Kennett, 78 Fed. (2nd) 911, while the opposition has referred to Alabama Power Co. v Ickes, ... Fed. (2nd), ..., decided May 10, 1937, by Circuit Court of District of Columbia; Greenwood County v Duke Power Co., 81 Fed. (2nd) 986; Memphis Power & Light Co. v City of Memphis, ....SW (2nd) ..., decided by the Tennessee Supreme Court March 27, 1937.

All of these cases involving grants for power plants cannot be considered as established precedents for the reason that the Supreme Court of the United States just recently announced that it would hear and determine the Alabama Power Company and Iowa City Power and Light Company cases in the fall. (See New York Times, June 2, 1937). Until then this court can only speculate as to whether these previous rulings will be upheld or overthrown.

It is claimed that the tri-party agreement of October 8, 1936, and the legislation under which it was executed, unlawfully delegates legislative power of the city of Cincinnati and the state of Ohio to the President of the United States, and the federal administrators. The Federal Emergency Relief Appropriation Act of 1935 states that in order "to provide relief, work relief and to increase employment by providing for useful projects," the sum of $4,-000,000 000 is appropriated. Of this sum there is allotted for highways, roads, streets and grade crossing elimination, $800,000,-000. The act specifically provides that no part of the funds appropriated for public highways and grade crossings need be matched by the state or territory.

The chief complaint of the taxpayer is that the act states "that the expenditure of funds from the appropriations made herein for the construction of public highways and other related projects shall be subject to such rules and regulations as the President may prescribe * * * and preference in the employment of labor shall be given * * * to persons receiving relief, where they are qualified, and the President is hereby authorized to predetermine for each state, the hours of work and the rates of wages to be paid to skilled, intermediate and unskilled labor engaged in such construction therein * * *."

In order to accept such grants the General Assembly passed certain legislation (§1228-1, GC) authorizing the director of highways in the state of Ohio to accept grants or loans from the Federal Government for the elimination of grade crossings. §17-4, GC, provides that prior to the letting of any contract for a public improvement, that the department of industrial relations shall determine the prevailing rates of mechanics and laborers for the job.

This section specifically reads, however, that this shall not apply to "public improvements in any case where the Federal Government or any of its agencies furnishes by loan or grant, all or any part of the funds used," "provided that the Federal Government or any of its agencies prescribes predetermined wages to be paid to mechanics and laborers employed in the construction of such improvements."

The tri-party agreement between the state director of highways, the city and the railroad company likewise provides that "all plans, specifications, estimates of costs,

awards of contract, acceptance of work and procedure in general, are subject at all times to all Federal laws, rules, regulations, orders and approvals applying to it as a Federal project."

The legislation gives the President the right to predetermine wages and hours of labor, and in this case wages and hours actually have been predetermined. Counsel for plaintiff maintains that the right to fix wages and hours of labor is a function of the legislative bodies of the city and state, and this procedure amounts to an unlawful delegation of that power. See—Panama Refining Co. v Ryan, 293 U. S. 388, 414; 1 O.O. 389; Schechter Poultry Corporation v United States, 295 U. S. 425, 529, 2 O.O. 493.

Under §1, Article II, of the Ohio Constitution, all legislative power of the state is vested in the General Assembly, subject to the powers reserved to the people by the Initiative and Referendum. See—State ex Allison v Garver, 66 Oh St 555.

Sec 34, Article II, of the Ohio Constitution provides that—

"Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employees; and no other provision of this Constitution shall impair or limit this power."

While until recently it was thought by a majority of our highest tribunal that the right to fix minimum wages conflicted with the Fourteenth Amendment, it seems at least temporarily settled that the state, through the legislature now has the power to enact minimum wage laws. West Coast Hotel Co. v Parrish, 300 U. S. ..., 81 L. Ed. advance sheets 455, 8 O.O. 89.

The Ohio Constitutional provisions are not self-enacting, but it will be noticed that while the state of Ohio has set up a minimum wage commission to establish minimum wages for private employers, the Department of Industrial Relations is given the right to fix the prevailing rates of wages on all public improvements except where Federal loans or grants are involved. (§17-4, GC).

Sec 57, Article II, provides:

"Except in cases of extraordinary emergency, not to exceed eight hours shall constitute a day's work, and not to exceed forty-eight hours a week's work for the workmen engaged on any public work car-ried on or aided by the state or any political subdivision thereof, whether done by contract or otherwise."

While this power is not self-executing within the view that it supplies a rule or means by which the right given may be performed, nevertheless the legislature is without power to make lawful a longer working day than eight hours. See—Stange v Cleveland, 94 Oh St 377, 380.

This power to fix wages and hours, it is claimed rests with the Ohio General Assembly, and cannot be delegated. It of course can be delegated if a proper standard is set forth to guide the administrative officer. See—Alter v Cincinnati, 56 Oh St 47; Akron v Dodson, 81 Oh St 66; Fassig v State, 95 Oh St 232; State ex Campbell v Cincinnati Street Railway Co., 97 Oh St 283; Yee Bow v Cleveland, 99 Oh St 269; Field v Clark, 143 U. S. 692; Brubaker v Union Pacific Railroad Co., 240 U. S. 1; Dastourgnes v United States, 122 Fed. 30; St. Louis Merchants Bridge Terminal v United States, 188 Fed. 191.

Legislative power to fix wages may also be delegated to a subordinate legislative body such as a board of education of a school district under our Constitution. Hilton v Board of Education, 51 Oh Ap 336, 345-6 (20 Abs 65), 4 O.O. 388.

But it is said that not only is there a delegation of legislative power to an executive, but like power is given to the President of the United States, who is not an officer of the state of Ohio. Such a delegation it is argued is without any color of authority. See—Wagner v City of Milwaukee, 177 Wis. 410.

The state of Ohio has specifically agreed in this case in consideration for a specific grant, to give the Federal authorities power to predetermine wages and hours of labor. The laws and Constitution of Ohio form part of the tri-party contract between the director of highways, the city and the railroad company. At the outset it can be said that the argument of counsel is that "an ulterior motive is wrought into the very structure" of the proceedings, and what "is even more important that the aim is not only ulterior, but essentially unlawful."

In this respect we need only point out that it is contended that since no limitation is placed upon the President, he is free to violate the provisions in Ohio as to wages and hours. Quoting from Ashton v Cameron County Water Improvement District, 298 U. S. 513, it is said that "our special concern is with the existence of the

power claimed, not merely the immediate outcome of what has already been attempted."

Such a philosophy of law can only be taken as an expression of opinion by an individual judge. There was no necessity to make it to decide the Ashton case, and it must therefore be considered as gratuitous dicta, which we hope will soon earn a "deserved repose."

The function of courts is to decide concrete cases, and not to deal in legal abstractions as to what might be the situation in the future in case some other legislation is attempted. See—3 American Law School Review, 706-7. Neither will the court anticipate a question of constitutional law in advance of the necessity of deciding it. That is not the habit of a court, and it will only pass upon constitutional questions when absolutely necessary to a decision of the case. Steamship Co. v Emigration Commissioners, 113 U. S. 33, 39; Burton v United States, 196 U. S. 283, 295; Abrams v Van Schlaick, 293 U. S. 188; Wilshire Oil Co. v United States, 295 U. S. 100; Ashwander v Tennessee Valley Authority, 297 U. S. 288, 346.

There is no presumption that the predetermined wages fixed by the President will violate the Ohio constitutional provisions, and in fact they do not. Counsel claim. however, that no delegation of power can be given to the President, who, so far as the city is concerned, is an outsider. Instances of attempts to delegate authority to private citizens to exercise either legislative or administrative duties being denied, are numerous. See—Cook v Cincinnati, 107 Oh St 223; Smith Agricultural Chemical Co. v Calvert, 7 N.P. (N.S.) 103; Sage v Akron, 30 N.P. (N.S.) 72.

If this was a delegation of authority to a private citizen, and not conditioned upon accepting a gift, the instance might be clear. This is a delegation of authority to the President of the United States as a condition to the acceptance of a grant or gift. The Federal Government under its spending power can relieve unemployment, and Congress can give to the President the authority to work out the details. The spending power of the Federal Government is in addition to the legislative power and not subordinate to it.

The General Assembly has fixed minimum wages and the Ohio Constitution defined the hours of labor. If the director of state highways would let a contract, the contractor would only have to comply with the minimum requirements. So in a Federal construction project the only complaint an Ohio taxpayer could have would be if these provisions were violated.

From a Federal standpoint, Judge Parker, in Greenwood County v Duke, 81 Fed. (2nd) 986, said:

"It was out of the question for Congress to prescribe the details of an extended program of public works. It appropriated money for the purpose, laid down the principles which were to guide the President and the administrator of Public Works in its expenditures, and left to them the working out of the details. The making of loans and grants in carrying out the policy thus laid down by Congress is the exercise of administrative and not legislative discretion. As said in **Wilmington & Zanesville Railroad Commission, 1 Oh St 77**, 88, and quoted with approval by the Supreme Court in Hampton & Co. v United States, 276 U. S. 394, 407: 'The true distinction therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.

The President is not to fix wages for private industry. The minimum wage law of Ohio is in no way repealed. All that the legislature is doing is in effect saying that as a condition to the state accepting a grant or gift, the Federal agencies may predetermine wages and hours on that public project. The legislature is not abrogating either our minimum wage law or the eight hour provision.

If perchance the Federal authorities fixed a wage standard lower than our minimum or provided for a longer work day than eight hours, a contract so entered into could be enjoined, but such action would not necessarily invalidate the bonds issued.

But all difficulty can be dispelled if it is once realized that the Federal Government could make this improvement without the aid of the state, or the city. A history of the conditional grants made in past years, and a true understanding of the taxing power is essential in making this clear.

The earliest type of conditional gifts or grants is that which was made when Ohio was admitted to the Union in 1802. The measure contained provisions whereby. in return for a grant of lands to each town-

ship by the Federal Government for schools and other concessions, the state pledged itself to withhold taxing the land for a period of years. Later, similar compacts were made when other territories were admitted to the Union. Such conditional gifts made to a territory about to become a state were approved by the courts. See Stearns v Minnesota, 179 U. S. 223.

These all involved gifts to a territory and not to a quasi-sovereign state. The gift, however, was made to a territory as a condition to it becoming a state, but the fulfillment of the condition occurred after it became a state. See Corwin: "The Spending Power of Congress," 36 Harvard Law Review, 548, 570.

Later grants of land were made under the Morrill Act conditioned upon the state establishing educational institutions. (U. S. C. A. §301 et seq.) In the National Treasury Act of 1911 specific grants of money were authorized to be made by the secretary of agriculture, on the ·condition that the states agree to co-operate in the organization and maintenance of a system of fire protection for forest lands. (U. S. Code, Title 16, par. 563).

Subsequently the· Federal Government by means of conditional grants, subsidized agricultural extension work in the states, and trained teachers in agricultural, industrial and home economics subjects. (U. S. Code Title 7, §§314-8; U. S. Code Title 20, §§11-15d). It has established vocational, rehabilitation and educational programs, maintained nautical schools, encouraged experiments in reforestation, and the construction of highways, equipped and trained the National Guard and many other functions normally performed only by the states. (U. S. Code Title 29, §§31-38; U. S. Code Title 34, §1122; U. S. Code Title 16, §581; U. S. Code Title 23, §§1-25; U. S. Code Title 32).

All of these acts show that there has been a constant movement to join the diverse powers in the National Government and the powers of the state in co-operative matters aimed to promote the general welfare of both. These have been rendered effective by means of conditional gifts' or grants whereby the Federal Government held out some inducement to the states so that they would exercise their reserved powers.

Numerous, instances of gifts to public bodies, states and municipalities on conditions set forth by the donor could be cited. Only recently Mr. Mellon gave his valuable art collection to the United States Government upon condition that the trustees should be selected in a certain manner. By accepting the gift upon such a condition, Congress did not surrender any of its sovereign powers to Mr. Mellon.

Objections presented to Federal grants have usually been two-fold. They have been attacked as unfair to the more populous states which claim they are paying a large share of the national income, while the .grants are given to states which contribute but a small portion of the national revenues. The answer to this objection is that it is unfair to credit to a state an income just because some wealthy citizens live there. A New York resident may derive his income from oil or gold produced in some far western state.

It is likewise said that these gifts tend to destroy the initiative of the states, but surveys seem to indicate that they stimulate rather than lessen the interest of a state in public projects. See Jane Perry Clark: "Joint Activity Between Federal and State Officials," Political Science Quarterly, June 1936.

We are not concerned with questions of policy, but only with the legal and constitutional problems of the grant. In the case before us the Federal Government · says that it will make a gift to the state of Ohio of $650,000 to eliminate the grade crossings in question, provided that "all plans, specifications, estimates of costs, etc. shall be subject to Federal laws, rules and regulations." Under §7 of the Federal Emergency Relief Appropriation Act of 1935, the President has the power to determine the rates of wages, which "shall be determined in advance of any bidding thereon." §17-4, GC, provides that on public improvements where there is Federal aid, this may be done.

By virtue of these provisions the state is merely accepting a gift or grant upon a condition, and in turn has passed the fund over to the city upon the same terms and conditions. The acts passed by the legislature of the state are merely enabling acts, specifically authorizing acceptance of Federal grants.

It is well settled today the gifts may be accepted by a municipal corporation upon conditions and with restrictions, provided they are such as may lawfully be imposed. Nelson v Georgetown, 190 Mass. 225; Libby v Portland, 105 Me. 370; Schneider v Grand Rapids, 211 Mich. 399; Kouffel v Hoboken, 71 N. J. L. 518.

In Ohio, both the state and the city of Cincinnati are authorized by statute to accept gifts upon "terms and conditions."

(§18, GC). The state of Ohio and the city of Cincinnati have a right therefore to accept this gift from the federal government, provided the conditions are lawful.

Here counsel for the taxpayer claims that the conditions involve a surrender of the sovereignty of the state to the Federal Government, and likewise that the state and Federal Government are being coerced to so surrender their powers.

It would be supposed upon reading the Constitution, that the question of whether Congress has exercised a granted power or not, is one to be determined independently before the Tenth Amendment of the United States Constitution is considered. But the prevailing view, at least during 1935 and 1936, was that the Tenth Amendment was some sort of magic glass through which to look in order to discover the scope of the powers previously conferred upon Congress by the original Constitution. See Hammer v Dagenhart, 247 U. S. 251; Railroad Retirement Board v Alton Railroad Co., 295 U. S. 330; Ashton v Cameron County Water Improvement District, 298 U. S. 513; Butler v United States, 297 U. S. 1; Carter v Carter Coal Co., 298 U. S. 238, 295.

This view must therefore be given some credence as it is to be considered the majority view of the highest tribunal. Does, therefore, the imposing of authority on the President of the United States to predetermine wages, operate as an abdication of sovereign power to the United States by the state of Ohio, secured by coercion by the Federal Government?

In Ashton v Cameron County Water Improvement District, supra, the court held that the municipal bankruptcy act permitting municipal corporations and other subdivisions of the state unable to pay their debts as they mature, to resort to the Federal Courts of Bankruptcy to effect readjustment of obligations was invalid, because it necessarily implied power in the Federal Government materially to restrict the states in control of their fiscal affairs. At page 531 Mr. Justice McReynolds said:

"Neither consent nor submission by the states can enlarge the powers of Congress; none can exist except those which are granted. The sovereignty of the state essential to its proper functioning under the Federal Constitution can be surrendered."

This is a somewhat misleading statement, and was unnecessary to a decision of the issues presented. It would place our governmental structure in an anomalous position, for the Federal Government would be unable to act because of the reserved rights of the states, and states, though under no constitutional inhibition, might be unable to act for practical reasons.

The viewpoint is more clearly expressed in Butler v United States, 297 U. S. 1. There the court held invalid the Agricultural Adjustment Act because it invaded the reserved rights of the states. The court said that it was a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the Federal Government.

The decision turned on the proposition that the proposed beneficiaries of Federal largess were not free to reject the benefit because they were coerced in so doing. But Mr. Justice Roberts expressly said that the case was to be distinguished from those in which there were conditional appropriations of money or grants in aid of education (See page 73).

From these opinions we gather that it is proper to make Federal grants, provided that the condition imposed on the recipient is not an unlawful one, and provided also that power is not obtained by coercive methods.

It was stated in that case that individual recipients of bounties were coerced. In one case where the state was to be the recipient, the court refused to entertain the action because it held that the state was free to accept or reject the grant, and in another for procedural reasons it would not entertain jurisdiction. Massachusetts v Mellon, 262 U. S. 447. See also Florida v Mellon, 273 U. S. 12.

There is considerable question as to whether a taxpayer can raise the question, but we find no coercion here, nor is any seriously claimed.

The state of Ohio or the city of Cincinnati is free to accept the grant or reject it, but if either does accept it, the acceptance must be on the conditions imposed. There may have been an inducement to accept it, but there was nothing obligatory on the state or city to accept it. We have had numerous instances where the people, by voting down bond issues, have indirectly refused to take advantage of these grants.

There is no coercion present in this case, for certainly threat of loss and not hope of gain is to be the test of economic coercion. Economic pressure by the Federal Government upon the states is immune

from attack if individual behavior is not compelled. (Massachusetts v Mellon, supra).

Before determining whether the state has abdicated any of its sovereign powers, let us examine the purpose of the Federal Emergency Relief Appropriation Act of 1935. It was designed to relieve unemployment, a situation which was nation wide. The Federal Government had a right to tax and appropriate moneys for the relief of unemployment. Such purpose was in promotion of the general welfare.

It must be conceded that the right to regulate grade crossings is within the police power of the state, and that Congress heretofore has never undertaken the work of the elimination of grade crossings under its powers over interstate commerce. Chicago, Burlington & Quincy R. R. v Railroad Commission, 237 U. S. 220; Great Northern Railway Co. v Minnesota, 246 U. S. 434; Erie Railroad Co. v Public Utility Commission, 254 U. S. 394; Railroad Commission v Southern Pacific Railroad, 264 U. S. 331; Lehigh Valley Railroad Co. v Public Utility Commission, 278 U. S. 24.

However, the Federal Emergency Relief Appropriation Act of 1935 was designed to relieve unemployment, and the fact that grade crossings were selected as projects for improvement is only an incident of the act. Therefore, it must be conceded that the Federal Government could undertake this project without co-operation from the state, exactly as it could establish a national park or erect a public building if the purpose was to relieve unemployment. See Helvering v Davis, 300 U. S. ...; 81 L. Ed. (advance sheets) 808-9.

The fact that it chose to co-operate with the states by way of making a conditional grant should not affect its right, if it saw fit to proceed directly. The National Government has the authority to proceed independently of the state to relieve unemployment, while the state can proceed independently of the National Government to eliminate grade crossings. The powers, therefore, are not reserved exclusively for the state, but they overlap. See J. A. C. Grant: "Commerce Production and Fiscal Powers of Congress." 45 Yale Law Journal, 991, 1003, 1004.

If this grade crossing elimination were viewed as a separate undertaking by the Federal Government, the project would clearly fail, as not being an expenditure to promote the general welfare. If it is considered as a link in a single nationwide program of public works to relieve unemployment, then, under the ruling in Helvering v Davis, supra, it is clearly valid.

The test in all conditional grants should be, whether the condition is germane to the purpose for which the grant was given. There is nothing in Butler v United States, supra, which contradicts that theory. Mr. Justice Roberts was unwilling to say that Congress cannot attach conditions to its expenditures, and thereby insure the accomplishment of the ends sought by the legislation. This is evident from the somewhat illusory distinction he makes between "a statute stating the conditions upon which moneys shall be expended, and one effective only upon the assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced." (Page 73).

This being true, Congress had the right, in order to relieve unemployment, to select the elimination of projects such as grade crossings to carry out its program, as this was an appropriation to promote the general welfare.

Therefore it would seem that if the legislature had other or additional purposes, which considered apart it had no constitutional authority to make effective, that would not result in invalidating the act. See Ellis v United States, 206 U. S. 256; Stephenson v Binford, 287 U. S. 251.

The question now confronting the court is as to whether or not the delegation by the state to the President, of the duties imposed by this legislation and contract, render the program invalid. The Federal Government, under its powers to promote the general welfare, could carry on this program without the assistance of the state. It could likewise co-operate with the state in carrying on such a program, provided the conditions imposed did not cause the state to abdicate its sovereignty.

The court feels that this point was completely answered by Mr. Justice Cardoza in the Social Security Act cases, in his reply to Mr. Justice Sutherland's dissent:

"Finally and chiefly, abdication is supposed to follow from §904 of the statute, and parts of §903 that are complimentary thereto. §903 (a) (31). By these the secretary of the treasury is authorized and directed to receive and hold in the unemployment trust fund, all moneys deposited therein by a state agency for a state unemployment fund and to invest in obligations such portion of the fund as is not in his judgment required to meet current withdrawals. We are told that Alabama, in consenting to that deposit, has renounc-

ed the plenitude of power inherent in her statehood.

"The same pervasive misconception is in evidence again. All that the state has done is to say in effect through the enactment of a statute, that her agents shall be authorized to deposit the unemployment tax receipts in the treasury at Washington. The consent may be revoked. The deposits may be withdrawn. The moment that the state commission gives notice to the depository that it would like the moneys back, the treasurer will return them. To find state destruction there is to find it almost anywhere. With nearly as much reason one might say that a state abdicates its functions when it places the state moneys in a national bank * * *

"The inference of abdication thus dissolves in thinest air when the deposit is conceived of as dependent upon a statutory consent, and not upon a contract effective to create a duty. By this we do not intimate that the conclusion would be different if a contract were discovered. Even sovereigns may contract without derogating from their sovereignty. Perry v United States, 294 U. S. 330, 353, 95 A.L.R. 1335; 1 Oppenheim, International Law, 4th Ed., §§493, 494; Hall, International Law, 8th Ed., §107; 2 Hyde, International Law, §489. The states are at liberty, upon obtaining the consent of Congress, to make agreements with one another. Const. Art. I, §10, Par. 3; Poole v Fleeger, 11 Pet. 185, 209; Rhode Island v Massachusetts, 12 Pet. 657. We find no room for doubt that they may do the like with Congress if the essence of their statehood is maintained without impairment. Alabama is seeking and obtaining a credit of many millions in favor of her citizens out of the treasury of the nation. Nowhere in our scheme of government—in the limitations express or implied of our federal government—do we find that she is prohibited from assenting to conditions that will assure a fair and just requital for benefits received."

See Charles C. Steward Machine Co. v Davis, 300 U. S. ..., 81 L. Ed. (advance sheets), 792, 793.

The state of Ohio is receiving $650,000 in return for permitting the donor to say how the improvement shall be conducted so that the unemployment situation will be relieved. This is not abdication but co-operative effort for the welfare of state and nation.

When viewed solely from the state question, Mr. Justice Stone commented as follows:

"The United States and the state of Alabama are not alien governments. They co-exist within the same territory. Unemployment within it is their common concern. Together the two statutes now before us embody a co-operative legislative effort by state and national governments, for carrying out a public purpose common to both, which neither could fully achieve without the co-operation of the other. The Constitution does not prohibit such co-operation.

"As the state legislature is not the product of a prohibited coercion, there is little else to which appellees can point as indicating a surrender of state sovereignty."

See Carmichael v Southern Coal & Coke Co., ... U. S. ..., L. L. Ed. (advance sheets) 825.

There is no coercion here, and no abdication of sovereignty. If the state can designate the United States Treasury as its depository for social security funds, then we can see no reason why the state cannot permit the Federal agencies to fix wages, hours and conditions of labor to carry out effectually a policy, nation-wide in its scope, to relieve unemployment.

Our attention has been called to the case of Franklin Township v Tugwell, 85 Fed. (2nd) 208, wherein it was held that there was an unlawful delegation of power because there was no criterion set forth in this Emergency Act of 1935 to govern the President's course as to housing and other enumerated projects.

This court has serious doubts under the rule in Massachusetts v Mellon, supra, whether the question of unlawful delegation of power by Congress to the President can be raised in this action brought by a municipal taxpayer.

We are of the opinion it cannot be. If, however, Massachusetts v Mellon, supra, was decided only because there was no remedy available, we desire to call attention to the language of the court in Franklin Township v Tugwell, supra, at page 220:

"We are not here confronted with an appropriation for internal improvements of a national character or importance, or for the erection of public buildings, or the grant or loans to a state or municipality to carry out public work projects. As to these we might find in the nature of the objec-

tion, a well beaten path by which to supply the omitted means to that end."

Apparently that court did find that well beaten path for it recently decided the case of Alabama Power Co. v Ickes, ... Fed. (2nd) ..., (decided May 10, 1937 by the Court of Appeals of the District of Columbia) involving Federal grants adversely to the contentions made here by the plaintiff.

There has been a feeling since Ryan v Panama Oil Co., supra, and Schechter v United States, supra, that Congress has been delegating legislative power to the President indiscriminately. Those who so contend have neglected to ascertain whether in these many acts there is a standard set to guide the executive.

Section 7 of the Federal Emergency Relief Appropriation Act of 1935 states:

"The President shall require to be paid such rates of pay for all persons engaged upon any project financed in whole or in part, through loans or otherwise by funds appropriated by this joint resolution, as will in the discretion of the President accomplish the purpose of this joint resolution, and not affect adversely to tend to decrease the going rates of wages paid for work of a similar nature."

In other words, the President is in effect to maintain the prevailing rate of pay for similar work. That is the same power the Department of Industrial Relations has in Ohio, under §17-4, GC.

This act does not therefore constitute a grant to the Executive of a roving commission to inquire into evils and upon discovering them to do anything he pleases. A definite standard controls the Presidential action.

As said in Hampton & Co. v United States, 276 U. S. 394, 409:

"If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."

See also Field v Clark, 143 U. S. 649, 680.

The claim of Congressional delegation of power so far as wages are concerned can therefore be dismissed, even though it is the opinion of the court that this taxpayer cannot raise that question.

As we have pointed out, this is a nation-al project for unemployment by the Federal Government, being undertaken under the general welfare clause, and that there is neither an unlawful delegation to the President nor to the Federal agencies, by either Congress or the General Assembly.

The conditions imposed as an acceptance of the grant were germane to the purpose for which the grant was given. It is inconceivable how a relief and unemployment program on a nation-wide scale could be carried out except by co-operative legislation of state and Federal Government.

In upholding our own relief laws as expenditures for public purposes, Judge Jones remarked in State ex Ach v Braden, 125 Oh St 307, 311:

" 'Salus populi suprema lex est'. This is one of the ancient maxims of the law, that the welfare of the people is the paramount law. It is the polestar of police power legislation * * *. Acting within its scope, and in the exercise of its police powers, this poor relief act was passed by the General Assembly, with the intent of promoting the common welfare. Its purpose is the alleviation of human suffering and the prevention of want by aiding the poor in their distress. And so, like the Good Samaritan of old (St. Luke 10; 34) the state has extended a helpful hand to those of its people who, perhaps through no fault of their own, become destitute and needful of the necessaries of life."

The state therefore, in accepting this grant by the Federal Government, under the general welfare provision. is likewise alleviating. its only problems of relief

The Federal Government on the other hand in making the grant to and in the relief of unemployment, is merely stipulating conditions that the funds will be used in such a way as will best accomplish that purpose. Such a stipulation of necessity requires a control of employment by those making the grant.

This court feels that since the decision in Helvering v Davis, supra, and Carmichael v Southern Coal & Coke Co., supra, it has been clearly stipulated that conditional grants to states would be upheld where the act held out only an inducement for the state to exercise its reserved powers in a co-operative venture with the Federal Government.

"Our dual form of government has its perplexities, state and nation having different spheres of jurisdiction as we have

said; but it must be kept in mind that we are one people; and the powers reserved to the states and those conferred on the nation are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral." Hoke v United States, 227 U. S. 308.

The court therefore is not willing in the relief of unemployment to say the states and Federal Government cannot co-operate to alleviate it. A political no man's land of inactivity was never proposed to be created under our Federal system in such a situation, for the state of Ohio and the Federal Government are not to be treated as alien governments: If the conditions here imposed could be made by a private donor, and accepted by the state and Federal Government, by reason of strained construction the latter is not to be placed in a more unfavorable light than the private citizen. The conditional grants of the Federal Government to build highways, schools, bridges, and eliminate grade crossings are not to be denied to this state for reasons that necessitate treating the states and the Federal Government as total strangers. They will not become pockmarked or contaminated by co-operative action.

It has been said that by reason of the tri-party contract the state is lending its credit to the city and to the railroad company contrary to **Article VIII, §5 of the Ohio Constitution.** The state of course is not furnishing any funds of its own for this project, and the contract stipulates that it shall not. Neither are any of the funds used for rails, and in this respect the case can be distinguished from **Cincinnati v Harth, 101 Oh St 344.**

The railroad company is supplying $100,-000 and all of the new track and ties necessary without cost to the city or Federal Government. How, under such circumstances, can there be any extension of credit by the state or to the city? The cases of **City of Newark v Fromholz, 102 Oh St 81 and Ohio Traction Co. v Huwe, 127 Oh St 445,** completely overrule plaintiff's contention. Obviously, for the same reasons there is no advancement of credit by the city to the railroad company violative of **Article VIII, §6, of the Ohio Constitution.**

Since we have considered this conditional grant as one in the interest of the general welfare to relieve unemployment, it is within the power of the Federal Government not to make all provisions subject to competitive bidding. The purpose is to furnish work and labor to as many people on relief as possible. This can best be done by force- account.

The court has looked upon this project merely as a small part of a national program in the interest of the general welfare to relieve unemployment. This crisis is not over, as many are still without work. While there has been some recovery, many of the same conditions exist as did in 1932, when two very farseeing justices of the Supreme Court realizing the prevailing economic conditions said:

"The people of the United States are confronted with an emergency more serious than war. Misery is widespread in a time not of scarcity, but of over-abundance. The long continued depression has brought unprecedented unemployment, a catastrophic fall in commodity prices and a volume of economic losses * * *."

See Brandeis, J., in New State Ice Co. v Liebman, 285 U. S. 262, 306.

Less than a month ago, a majority of the court speaking through Mr. Justice Cardozo, said:

"Spreading from state to state, unemployment is an ill not particular, but general, which may be checked if Congress so determine by the resources of the nation. If this can have been doubtful until now, our ruling today in the case of the Charles C. Steward Machine Co. v Davis, ... U. S. ..., 81 L. Ed. (advance sheets) 779 has set the doubt at rest."

Helvering v Davis, 300 U. S. ..., 81 L. Ed. (advance sheets) 808.

Under such circumstances the latest expression of the court forces one to the conclusion that the claims of the plaintiff fall of their own weight.

Briefly summarizing these conditions the court holds:

(1) That the appropriations made under the Federal Emergency Relief Appropriation Act of 1935 were enacted under the provisions of Article I, §8 of the United States Constitution to provide for the general welfare of the nation;

(2) That Congress has power under the general welfare clause to appropriate and

**350**

expend funds for relief of unemployment;

(3) That the selection of work to be performed for the elimination of grade crossings was but part of a plan to alleviate unemployment;

(4) That the state of Ohio and the city of Cincinnati have authority to eliminate grade crossings and likewise provide funds for the relief of the unemployed;

(5) That in furtherance of a plan calling for state and Federal co-operation the United States Government is empowered to make a conditional gift or grant to the state of Ohio, provided that the conditions imposed do not cause the state to abdicate its quasi-sovereign powers;

(6) That in view of the fact that the Federal Government could legislate directly in reference to unemployment, that the conditions imposed as to wages, hours of labor, qualifications of labor on a public project for the elimination of grade crossings did not violate the provisions of the Tenth Amendment of the United States Constitution, nor operate as an unlawful delegation of power from the state or city to the national government;

(7) That the state and city had a right to accept such a conditional grant or gift without abdicating any sovereign rights as the Federal Government had the power to fix conditions of employment by reason of its right to relieve unemployment;

(8) That the Federal Government and the state are not alien governments, and have the power to co-operate in a plan to eliminate grade crossings.

The injunction sought is hereby denied, and the petition of the plaintiff dismissed.